NICHOLS, Circuit Judge.
 

 This is a suit brought in the former United States Court of Claims seeking a refund of additional federal income taxes assessed and collected by the Internal Revenue Service (IRS) for 1972 and 1973 plus accrued interest and costs. The IRS refused to allow more than 30 percent of the net profits of appellees’ business, Van Dyke Supply Company, to qualify for the 50 percent maximum tax rate on “earned income” established by section 1348 of the Internal Revenue Code of 1954. The United States Claims Court
 
 *
 
 held that appellees were entitled to a refund of the additional federal income taxes assessed for 1972 and 1973, together with assessed and accrued interest.
 

 The main issue on appeal is whether the trial court was correct in concluding that capital was not a material income-producing factor in appellees’ business and that the 30 percent limitation on net profits qualifying for the maximum tax rate on “earned income” would therefore not apply.
 
 *959
 
 For reasons set forth below, we agree with the trial court’s conclusion and affirm.
 

 The relevant facts are not in dispute. Mr. L.J. Van Dyke (Van Dyke) owns and operates, as a sole proprietorship, a taxidermy supply business in Woonsocket, South Dakota. Marjorie Van Dyke, wife of L.J. Van Dyke, also works in the business, without salary. She filed a joint return with her husband for the tax years in question, and is co-appellee in this case. They design and produce artificial eyes, forms, wood panels, and other materials and supplies, and sell them to commercial and museum taxidermists and competitive taxidermist supply dealers. The items are sold through an annual catalog and unlisted items may be purchased by special order.
 

 Van Dyke began practicing taxidermy in 1946 after having had only a few weeks of experience helping an Army captain restore damaged bird specimens in an overseas university museum. After reading all available material on taxidermy, Van Dyke concluded that the state of the art was unsatisfactory. He thus began experimenting with different designs and materials to produce his own forms, artificial eyes, and adhesive materials. The forms are the interi- or parts of exhibits, to be covered by skins or feathers.
 

 In 1949, Van Dyke distributed a one page mimeographed sheet to the taxidermy trade offering a limited selection of deer head and bird body forms and several special order items.
 

 Van Dyke continued experimenting, developing, and improving different taxidermy materials such as glass eyes and form designs for different specimens. By 1973, Van Dyke’s catalog offered approximately 600 different types and sizes of forms and 1,200 types and sizes of eyes. At that point his business supplied about 70 percent of the United States market and about 60 percent of the world market for glass eyes.
 

 In addition, Van Dyke began designing and producing a line of wood panels and plaques for mounting. To aid taxidermists, he also sold miscellaneous supplies, which included chemical compounds and tools which he either developed, bought wholesale and repackaged for resale, or bought wholesale and altered and improved before resale.
 

 The Van Dykes employed approximately 24 people in 1972, and 20 people in 1973, full or part-time, to produce the forms, eyes, and panels. These employees were previously unskilled and paid slightly above minimum wage. Each new employee received his or her training by observing the work of a seasoned employee. Van Dyke closely supervised the work of the new employee until that employee began making an acceptable product.
 

 Van Dyke continued to research and experiment with taxidermy materials. He also supervised employees, spot-checked finished products, determined production quantity, and personally designed and supervised the production of special order items.
 

 The machinery and equipment necessary for production of the taxidermy supplies were not extensive. The major items included two kilns, a number of artist brushes, foam machines, a shaper for panels, form casts, and devices used to make eyes that were designed and made by Van Dyke himself. The business was located in a former creamery and locker plant. The costs of the physical assets of the business during the years 1972 and 1973 totaled $40,-861 and $105,237, respectively. These costs included buildings and additions, machinery and equipment, office equipment, vehicles, and an airplane purchased in 1973 for $55,-423 to enable Van Dyke to attend taxidermy association functions and to call on major clients.
 

 A fact that might appear conclusive at first blush is that there was no passive debt or equity capital investment by others in the appellees’ business during the tax years in issue. We cannot, however, end the analysis there.
 

 Appellees purchased raw materials for use in their year-round production of taxidermy supplies. During the hunting season in autumn and winter, the stock generated
 
 *960
 
 by the employees was depleted. After the first of the year, demand for taxidermy supplies would fall off and the employees would concentrate on rebuilding the inventory. Appellees sold the merchandise primarily through the catalog, and they required full remittance with the order or one-third down and the balance C.O.D. This arrangement allowed Van Dyke to operate his business without borrowing operating capital or having to invest substantial amounts of money in inventory at any given time of the year.
 

 During the tax years in question, the maximum marginal tax rate on earned income was limited to 50 percent. 26 U.S.C. § 1348(a). For purposes of section 1348, the Internal Revenue Code defines earned income as any income which is earned income within the meaning of section 401(c)(2)(C) or section 911(b). The trial court thought that appellees did not meet the criterion in section 401, for that section was designed to allow an individual author or inventor to treat royalty and licensing payments as earned income. Neither appellant nor appellees have raised any objection to this conclusion. Rather, the issue on appeal is whether the trial court properly held that appellees’ net profits were “earned income” within the meaning of section 911. The trial court found that, in appellees’ taxidermy business, capital did not constitute a material income-producing factor, and thus the net profits must be considered earned income as defined in section 911(b).
 

 Section 911(b) provides:
 

 For purposes of this section, the term “earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.
 

 The applicable IRS regulation, although promulgated after the tax years in question, provides guidance in determining this issue. Section 1.134-3(a)(3)(ii), Income Tax Regs., states:
 

 Whether capital is a material income-producing factor must be determined by reference to all the facts of each case.
 
 Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business,
 
 as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general,
 
 capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual.
 
 Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. [Emphasis supplied.]
 

 Appellant argues that capital was a material income-producing factor in the appellees’ business because of the amount of materials used in producing the goods sold. Appellant states that the cost of materials, $162,496 in 1972, and $222,630 in 1973, cannot be viewed as immaterial in relation to total gross sales of $713,917 and $866,039, respectively. Appellees argue persuasively
 
 *961
 
 that these figures are not meaningful as to the amount of capital used in the business because they are the sum of the cost of raw material turned over repeatedly in any given 12 months. Although the cost of materials used in appellees’ business constitutes one factor to be considered, a mere numerical comparison of such costs with gross income cannot serve as the basis for deciding whether capital is a material income-producing factor in this case. Rather, it must be decided, through an analysis of all the facts, whether a substantial portion of the gross income of appellees’ business is attributable to the employment of materials and other capital assets. Exacting advance payments with the orders reduced the total investment of the producer’s own capital unrecouped by receipts at any given moment, and reflected a management policy to impose stringent limitations on the capital used in the business. The government did not argue that customer’s advance payments were capital contributions by them. If so, it was only to the extent appellees’ investment was reduced.
 

 For the most part, the materials appellees purchased consisted of raw materials used in producing glass eyes and various forms. The cost of materials also included the miscellaneous supplies that Van Dyke purchased, repackaged, and offered in the catalog without significant alterations. Only a small portion of the total gross sales, however, is attributable to the resale of these items. The miscellaneous supplies were offered primarily for the convenience of the customers. Van Dyke transformed the raw materials into finished taxidermy products through a labor-intensive process he developed. The designing and sculpturing of the casts for forms and the development of the technique for producing the eyes required a great deal of personal effort and artistic skill on the part of Van Dyke. Moreover, the actual process of transforming the raw materials into the finished taxidermy supplies required skilled employees. This is clearly not a situation where the gross income of the business is attributable normally to the mere purchase of materials which are then resold, or to the installation of unaltered materials.
 
 Compare Moore v. Commissioner,
 
 71 T.C. 533 (1979) where gross income of a retail grocery store was attributable to price paid for its inventory;
 
 United States v. Korczynski, 42
 
 A.F.T.R.2d 5799 (S.D. Ohio 1978) where employees added no value to electrical items they installed and the cost of materials and supplies equaled 50 percent of gross receipts;
 
 Rousku v. Commissioner,
 
 56 T.C. 548 (1971) where employees did not alter the automobile parts they installed and nearly 40 percent of the business’ gross income derived from the sale of parts. Rather, the factor most responsible for the gross income of appellees’ business was the value added to the raw materials by the personal efforts and skill of Van Dyke and his employees.
 

 Appellant contends that since the cost of materials was a factor in establishing the sales price of appellees’ product, capital is necessarily a material income-producing factor. This fact alone is not sufficient, however, as many artists, to some extent, consider the cost of supplies and studio fees in determining the price of their work. Unless the costs of materials were far more substantial in relation to the gross income, the fact that the cost of materials was a factor in establishing the sales price will not turn capital into a material income-producing factor.
 

 Appellant also argues that where the income of the business is dependent on the use of equipment and machinery, capital is a material income-producing factor. We cannot agree. Although the Van Dyke Supply Company used equipment and machinery to produce the finished product, the investment in this capital was not extensive. It could all have been leased with no material change in the nature of the business. The mere fact that a business invests in some machinery and equipment does not necessarily establish that capital is a material income-producing factor. Rather, it must be shown that the investment in capital assets is substantial, or that the use of the capital assets in a particular business is such that it is directly responsible for a substantial portion of the gross income of
 
 *962
 
 the business.
 
 See Nelson v. Commissioner,
 
 T.C.M. (P-H) ¶ 82,361 (1982) where a substantial portion of painting service’s gross income was attributable to capital as the use of blasting equipment alone accounted for 30 percent of gross income;
 
 Wilson v. Commissioner,
 
 T.C.M. (P-H) ¶ 82,289 (1982) where the value of depreciable assets used in egg-producing business totaled more than $449,000 in 1976, and $371,500 in 1977, while gross profit was approximately $995,-500 and $693,400, respectively. If, as we suppose as a hypothetical, the building, machinery, and equipment, had all been leased, the capacity of appellees’ business to generate the profits it did would have been unaltered, though the capital employed would have been reduced.
 

 We do not dispute that the Van Dyke Supply Company could not have functioned without materials, machinery, and equipment, but we agree with the Tax Court when it stated that “[f]ew modern businesses are conducted without the use of capital in some form or other, and it cannot be assumed that Congress intended such a narrow reading of the term ‘capital’ under section 1348.”
 
 Bruno
 
 v.
 
 Commissioner,
 
 71 T.C. 191, 201 (1978). The predominant factor in the appellees’ business was not capital, but the personal skill and expertise of Van Dyke and the labor of his employees. The financial success of appellees’ business depended, not on the return on capital investments, but, on the skill and personal efforts of appellees’ in supplying high-quality taxidermy products. The skills employed are those of Van Dyke, not the hired employees, who came to the business without skills.
 

 It is true, as appellant argues, that if capital is a material income-producing factor, the result is not changed by the fact that a portion of the gross receipts reflect value added to the items purchased. Any manufacturing business necessarily “adds value” in some degree to the items purchased if a profit is to be made upon resale. Where, however, the value added by personal skills is so substantial that the capital investment, by comparison, is relatively small, capital will not be deemed a material income-producing factor in the business. If Congress had wished to exclude any manufacturing operation, it would have known how to do so, yet appellant’s position hardly would allow any manufacturing income over 30 percent to qualify as earned income.
 

 In concluding that a substantial portion of the gross income of the Van Dyke Supply Company is not attributable to the employment of capital, we are mindful of the congressional purpose in enacting section 911(b). As the United States Court of Appeals for the Ninth Circuit noted—
 

 * * * The distinction Congress created is between income which is earned and income which is not earned. Congress made it clear when it devised the definition for earned income that it meant to include all income not representing return on capital. * * * Income which accrued to the individual from application of his personal skills, whether received in the form of wages, salaries, professional fees or otherwise, was intended to be “earned” income. Income which accrued to the individual as return on capital was not considered “earned.” * * *
 

 Robida v. Commissioner,
 
 460 F.2d 1172, 1174 (9th Cir.1972) (citations omitted).
 

 The short of it is that we are unable to perceive any income from the business which is “income which is not earned.” We hold that the gross income of appellees’ business, Van Dyke Supply Company, resulted primarily from the application of the personal artistic or technical skills of Van Dyke and his employees, taught by him, and that a substantial portion of its gross income cannot be attributable to the employment of capital in the business.
 

 AFFIRMED.
 

 *
 

 Pursuant to order of this court dated October 4, 1982, Judge Merow entered judgment on October 8, 1982, corresponding to the decision recommended in this case.