STERLING F. BLACK AND NANCY L. BLACK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Black v. Commissioner
Docket No. 2295-81.
United States Tax Court
T.C. Memo 1983-245; 1983 Tax Ct. Memo LEXIS 545; 46 T.C.M. (CCH) 29; T.C.M. (RIA) 83245; May 3, 1983. Thomas Smidt II and Patricia Tucker, for the petitioners. John W. Dierker, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in the amounts of $9,193.49 and £ 1,648.17 in petitioners' Federal income taxes for 1976 and 1977, respectively. The sole issue for decision is whether capital was a material factor in producing partnership income from a real estate business so that only 30 percent of petitioners' distributive share of that income is eligible for the maximum tax limitations prescribed by section 1348 [1] in the form in which that section was in effect in 1976 and 1977. *546 FINDINGS OF FACT When they filed their petition in this case, petitioners Sterling F. Black and Nancy L. Black were legal residents of Albuquerque, New Mexico. As husband and wife, they filed joint Federal income tax returns for 1976 and 1977. Sterling F. Black (petitioner) worked as a lawyer in Los Alamos, New Mexico, for approximately 10 years prior to 1965. In the early to mid-1960's, the Federal Government, which owned all of the land in Los Alamos, began selling some of its real estate. Together with certain associates, petitioner formed a partnership to acquire some of the real estate put up for bid by the Government. The partnership, which later became a corporation and then, during the years here in issue, a limited partnership known as Jemez View Investment Company (Jemez View or the partnership), acquired five parcels of real property. Prior to 1976, the corporation or partnership had disposed of four of these five pieces. The piece not disposed of was a 300-acre tract located on the edge of the Rio Grande Gorge. The land was extremely rocky with a very thin covering of soil which made development particularly difficult. Other would-be developers in the area *547 had gone bankrupt. Petitioner, as a general partner and the only active participant in the partnership, invested a tremendous amount of time and effort in devising various plans for selling the property. After failing to sell the land to developers in one or two undeveloped tracts, petitioner attempted to sell the land in lots of 10 acres each. The county in which the land was located had extremely stringent planning and zoning requirements. Petitioner adopted a subdivision plan which was designed to avoid certain county review procedures and drew up numerous implementing papers. The county's attempt to gain authority to review the subdivision led to litigation which petitioner eventually won. Petitioner encountered great resistance from local landowners and others to the sale of the land. Full page advertisements attacking the project were placed in the newspaper; meetings opposing the project were held; petitions against the project were signed; indeed, many members of the community banded together trying to forestall petitioner's project. Repeated meetings with the county commission were held. Permission for development was eventually extracted from the county, but *548 even then contention continued over such issues as sewage treatment and financial safeguards. (Petitioner had to agree, for example, to obtain performance bonds from the contractors running in favor of the county.) Petitioner later became embroiled in further disputes with the gas, electric, and water companies and with the road contractor. These confrontations resulted in meetings concerning possible violations of utility regulations by the electric company and litigation involving the gas company. All of these activities consumed petitioner's time. At some point, as the negotiating and maneuvering became increasingly complex, petitioner decided that he wished to change the form of the project from a corporation to a limited partnership, with himself as general partner. This transition was effected on January 1, 1972. Although at first there was one other general partner, this partner sold his general partnership interest rather than accept personal liability on a large bank loan. During 1976 and 1977, petitioner as general partner held a 67.5-percent interest in the partnership and the remaining interests were held by six or seven limited partners, whose individual interests *549 ranged from 3.125 percent to 6.25 percent of the partnership. The partners' total cash contributions to capital made in 1972 and 1974 equalled $39,733.03. In order to finance the development, petitioner negotiated for loans with various banks. After abortive attempts, he made an elaborate loan arrangement sometime prior to May 1974 with MIW Advisors, Inc. (MIW), located in Bethesda, Maryland. The loan, on which petitioner was personally liable, totaled $1.4 million. In order to fulfill the loan obligations with MIW, each sale of land had to be in cash, with the bank receiving approximately 70 percent of the purchase price. Petitioner aided individual buyers in securing financing. Overall, in addition to the $41,925.58 spent to purchase the land, the partnership expended $1,236,595.49 in development costs and approximately $177,197.99 in selling expenses. The partnership began receiving proceeds from the sale of developed lots in the mid-1970's, with the project ending in or shortly after 1977. Petitioner provided the detailed work, the imagination, and the perserverance to bring the project to successful completion. He handled the bookkeeping, financial planning, legal *550 drafting, negotiating, and litigating; although other partners were involved as investors, none took an active role in solving the problems that arose in selling the lots. Petitioner spent "nearly all" of his time on the project from sometime in the early 1970's until the project started winding down in 1976 and 1977. Petitioners reported $192,225 as their share of partnership income on their 1976 Federal income tax return. This amount included $21,000 which is properly reportable as salary. They reported $122,501 in partnership income for 1977 of which $20,000 should have been reported as salary. [2] Petitioners treated the full amounts of their distributive shares of partnership income as earned income taxable at the maximum tax rate of 50 percent then provided by section 1348. Respondent determined that only 30 percent of the partnership income was considered earned income eligible for the section 1348 maximum tax limitation, because capital was a material factor in producing the income. The parties have stipulated that the amounts properly designated as salary ($21,000 in 1976 and $20,000 in 1977) should be excluded from the computation of the 30-percent limitation on earned *551 income. OPINION As in effect during 1976 and 1977, [3] section 1348 provided a maximum tax rate of 50 percent on "earned income" or "personal service income" as defined in section 911(b). [4] That section defines income as "wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered." In cases where a taxpayer is "engaged in a trade or business in which both personal services and capital are material income-producing factors" an amount not exceeding 30 percent of his share of net profits shall be considered as "earned income" from personal services. Such 30 percent is eligible for the 50-percent maximum tax rate prescribed by section 1348. In this manner the 30-percent portion of the income derived from a business in which both capital and services are income-producing factors is given the same treatment under section 1348 as wages and salaries. *552 Section 1.1348-3(a)(3)(ii), Income Tax Regs., explains the circumstances in which capital is a material income-producing factor in an unincorporated business as follows: Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual. Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. The determinative question, then, is whether capital was a *553 material factor in producing the Jemez View partnership's income in 1976 and 1977, and that question is to be answered by consideration of all the facts. Bruno v. Commissioner,71 T.C. 191, 197 (1978). The parties do not seriously disagree on the facts. Respondent readily admits that petitioner devoted a large amount of time and effort in developing the land which the partnership finally sold; he concedes, and we concur, that personal services were a material income-producing factor in carrying out the project. This conclusion, however, does not decide the controversy. The controlling question is not whether personal services were material, or even critical, but whether capital was a material income-producing factor. We are compelled to conclude that it was. The partnership's income in the instant case was derived from the sale of lots. The parthership spent approximately $1,455,000 in acquiring the land, building the roads, installing sewage treatment facilities and other utilities, etc., and finally selling the property. True, petitioner performed invaluable legal and other services in connection with this development work. The buyers of the lots, however, *554 did not pay the partnership fees for petitioner's services. Instead, the partnership sold, and the buyers paid for, lots which had been improved through the use of capital as well as the application of petitioner's personal services. We must conclude that a "substantial portion of the gross income of the business is attributable to the employment of capital in the business." Sec. 1.1348-3(a)(3)(ii), Income Tax Regs. See Moore v. Commissioner,71 T.C. 533 (1979); Wilson v. Commissioner,T.C. Memo. 1982-289. Petitioner first argues that his receipts were "in substance, compensation for * * * [his] rendition of several years of professional services for the partnership," and thus eligible for the maximum tax rate. He stresses that, but for his unflagging services, no lots would have been sold nor income realized by the partnership. Thus, he concludes, his income was actually derived from personal services. We do not question that petitioner's extensive services were essential to the production of the partnership's income. The fact that his services were indispensible, however, does not show that capital was not material. The land itself and the *555 capital needed to develop it were also indispensible to the production of the income.Significantly, apart from petitioner's salary, his share of the partnership income was determined in accordance with his distributive share under the partnership arrangement. The evidence does not show that any portion of his 67.5 percent interest in the partnership income was allocated to him for services so that, arguendo, it might be compensation for services over the life span of the project. The record provides absolutely no basis for petitioner's argument that a port of petitioner's distributive share "in substance" represented deferred compensation. Petitioner next contends that we should focus on him individually rather than on the partnership, and he emphasizes that he personally had little "capital invested in his provision of these services." [5] On this basis he would have us conclude that his capital thus was only incidental to his contribution. But this argument overlooks the fact that we are here dealing with income produced by a partnership of which petitioner was a member. "[N]either the regulations nor the cases under section 1348 have made the result turn on whether the *556 capital was furnished by the taxpayer; the only question is whether capital was material in producing the income of the business. Sec. 1.1348-3(a)(3)(ii), Income Tax Regs."; Gaudern v. Commissioner,77 T.C. 1305, 1312 (1981). The purpose of the section 1348 test is to determine whether the income is attributable to personal services or capital or both, and we think it quite clear that both capital and services were essential to the production by the partnership of the income here in issue. Petitioner also contends that capital was not a major income-producing factor in the partnership's operations. He argues that the mere presence of capital, even in substantial amounts does not prove that capital was material, see Bruno v. Commissioner,supra, but that the relationship between the capital and the generation of income must be analyzed on a case-by-case basis, citing Zahler v. Commissioner,684 F.2d 356 (6th Cir. 1982), revg. and remanding a Memorandum Opinion of this Court. He concludes that capital was incidental to petitioner's *557 reportable income. In the present case, the partnership generated the income (of which petitioner received his distributive share) by selling developed lots. To prepare these lots for sale, as detailed in our findings, the partnership invested some $1.4 million of capital. The product of this investment was the land with improvements which individuals then purchased. Petitioner's services were undoubtedly necessary to the development of these saleable lots, but to conclude that capital was not material--was only incidental--to the generation of income from the sale of the developed lots would be to disregard reality. In virtually any business, personal services are necessary to the realization of income and the applicability of section 1348 has never been limited to cases in which the evidence showed that such services were insignificant. E.g. Moore v. Commissioner,supra;Wilson v. Commissioner,supra;Guadern v. Commissioner,supra.
Petitioner relies on four cases in which all or a portion of the taxpayer's income was held to be "earned income" within the meaning of section 1348: Bruno v. Commissioner,supra; *558 Roselle v. Commissioner,T.C. Memo. 1981-394; Zahler v. Commissioner,supra; and United States v. Van Dyke,696 F.2d 957 (Fed. Cir. 1982). These cases are readily distinguishable. In Bruno v. Commissioner,supra, the Court held that payments received in the taxpayer's bail bonding business were in the nature of fees for personal services. Jemez View's customers paid for developed land, not legal services. In Roselle v. Commissioner,supra, an identifiable portion of partnership income was derived from the performance of management services for which substantial capital was not required; such services constituted a business activity independent from the taxpayer's other activities in which capital was a material income-producing factor. Petitioner has identified no segments into which the partnership activities could be divided; we do not think his services in developing the lots for sale to customers constitute an activity independent of the development and sale of the land. Also distinguishable is Zahler v. Commissioner,supra, in which the taxpayer's income *559 was derived from commission sales [6] (which were so carried on the partnership books) and not from net profits so as to be outside the scope of sections 911 and 1348. Petitioner has not shown that his income was not from net profits or that a particular part of his distributive share was attributable to personal services. Finally, in United States v. Van Dyke,supra, the court held on the facts that capital was not a material income-producing factor in a taxidermy business, given the relatively insubstantial amounts of capital and the significant value added to the materials fashioned by personal services. The $1.4 million used in developing the land here involved was not insubstantial in relation to the partnership's net profits. We hold therefore that for the purposes of section 1348 capital was a material income-producing *560 factor in petitioner's real estate business. It follows that only 30 percent of the net profits of the business thus qualify for the benefits of section 1348. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. All Rules references are to the Tax Court Rules of Practice and Procedure unless otherwise noted.↩
2. The partnership returns are not in evidence and the record does not otherwise reveal how the partnership reported its income.↩
3. For taxable years beginning after 1978, sec. 1348(b)(1) was amended to eliminate the 30-percent limitation on earned income derived from a trade or business in which capital was material. Rev. Act of 1978, Pub. L. 75-600, sec. 442(a), 92 Stat. 2878. Sec. 1348 has been repealed for taxable years beginning after 1981. Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 101(c)(1), 95 Stat. 183. ↩
4. Sec. 911(b) provides as follows: (b) Definition of Earned Income.--For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services, and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.↩
5. This argument seems to overlook petitioner's personal guarantee of the $1.4 million MIW loan.↩
6. This Court has held that capital was not a material income-producing factor in a real estate brokerage business, Miller v. Commissioner,51 T.C. 755, 759↩ (1969), but petitioner's partnership income in the instant case is not, in any sense, analogous to the real estate commissions earned by the taxpayer in that case.