PAYNE E. L. THOMAS AND JOAN M. THOMAS, PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22049-82.        Filed February 1, 1989.

*Stanley L. Morris,* for the petitioners.

*Matthew J. Fritz* and *Jonathan P. Norris,* for the respondent.

CHABOT, *Judge:* Respondent determined a deficiency in Federal individual income tax against petitioners for 1978 in the amount of $3,302,808. After concessions by petitioners, the issues for decision are as follows:

(1) Whether petitioner-husband's business' method of valuing inventories of books at one-fourth of manufacturing cost immediately on publication, and at zero after 2 years, 9 months, clearly reflects income.

(2) Whether respondent's revaluation of petitioner-husband's business' 1978 inventory constitutes a change in petitioner-husband's business' method of accounting, requiring a section 481[1] adjustment to 1978 taxable income.

(3) Whether respondent specifically approved the business' method of valuing inventory, within the meaning of section 1.446-1(c)(2)(ii), Income Tax Regs.

(4) Whether respondent is estopped from changing petitioner-husband's business' method of inventory valuation.

(5) Whether petitioner-husband is entitled to a pre-1954 exclusion in the amount of $588,401.83 under section 481(a)(2).

(6) Whether petitioners are entitled to the benefits of the 50-percent maximum rate on personal service income under section 1348.

(7) Whether a house sold by petitioners in 1978 was their principal residence, entitling petitioners to defer recognition of gain under section 1034.

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioners Payne E.L. Thomas (hereinafter sometimes referred to as Thomas) and Joan M. Thomas, husband and wife, resided in Springfield, Illinois.

---

[1]Unless indicated otherwise, all section, subchapter, and subtitle references are to sections, subchapters, and subtitles of the Internal Revenue Code of 1954 as in effect for the year in issue.

## Background

Charles C. Thomas, Publisher (hereinafter sometimes referred to as Publisher), is a business which publishes scholarly, scientific, and technical books and journals, most of which deal with medicine and related topics.

Publisher was founded in 1927 by Thomas' parents, who owned and operated it as a partnership (hereinafter sometimes referred to as Partnership I). On January 2, 1946, Thomas became a partner in Publisher with his parents. (The resulting partnership is hereinafter sometimes referred to as Partnership II.) Thomas held a one-third distributive share in the profits and losses of Partnership II until October 1957. From October 2, 1957, to 1968, Thomas held a one-half distributive share in the profits and losses of Partnership II. In 1968, Thomas' father died, and Thomas and his mother continued to own and operate Publisher as a partnership (hereinafter sometimes referred to as Partnership III), each with a one-half distributive share in profits and losses. In 1975, Thomas' mother died, and Thomas bought her share, thus becoming the sole owner of Publisher. Thomas continued to own and operate Publisher as a sole proprietorship through 1978.

## Inventory

Throughout Publisher's existence (Partnership I, Partnership II, Partnership III, and Thomas' proprietorship), Publisher's income was reported on the accrual method, and Publisher used a consistent method of inventory valuation for stocks of books. Under this inventory valuation method, books are initially placed in inventory at a value of one-fourth of manufacturing cost. After about 2 years, 9 months (1,000 days), one-fourth of manufacturing cost for the remaining inventory is written off. (Initially, the cutoff date was 3 years, but many years ago the date was changed to 1,000 days to conform with the contractual royalty period of 1,000 days.) Under Publisher's standard author agreement, no royalties are paid unless 1,000 copies are sold within 1,000 days of publication. After 1,000 days, Publisher could cancel the author agreement for any reason, regardless of the number of copies sold.

After the writedown to one-fourth of manufacturing cost, and then to zero, of the inventory valuation of a book, Publisher continued to hold the book in inventory, and continued to list the book for sale in its annual sales catalogue.

Publisher generally set the retail price of a new book at four to five times its manufacturing cost. Typically, Publisher sold books at the retail prices listed in its sales catalogue, with a discount of 10 percent to libraries, volume discounts ranging from 10 percent to 50 percent for large-quantity purchases, and a discount of 60 percent on some books which had been held in inventory for an extended period of time. So long as a book was held in inventory, Publisher set its retail price at an amount equal to or greater than its original retail price for the newly published book.

In 1959, respondent's District Director issued the following letter to Partnership II:

Oct. 2, 1959

Charles C. Thomas - Publisher
327 East Lawrence Avenue
Springfield, Illinois

Report Dated: September 11, 1959
Fiscal Years: Ending 9-30-1957 and
9-30-1958

Gentlemen:

There is enclosed for your information and files a copy of a report covering the examination of your returns of income for the years indicated, recently made by a representative of this office. You have indicated your agreement to the adjustments shown in the report.

Very truly yours,
/S/ H.J. White
H.J. White
District Director
Enclosure

Enclosed with the letter was a report which included the following paragraphs:

This partnership was organized January 1, 1946 for principal purposes of publishing medical books and the distribution of medical journals. It is a family partnership composed of Charles C. Thomas and Nanette P.

Thomas, husband and wife, and Payne E. L. Thomas, their son. All partners are active in the operation of the enterprise. * * *

(a) *Inventory Valuation:*

Partnership consistently follows the practice of excluding from inventory all books over 2 years and 9 months old, because of the royalty agreements which provide for cancellation after expiration of such term. Books remaining in the inventory are priced at 1/4 of their cost, representing partnership's estimate of their fair market value, being lower than cost. Method used in inventory valuation appears to be a reasonable and realistic approach to the problem, based upon partnership's experience and, being consistently applied, was accepted as substantially correct by the examining officer.

Respondent audited Partnership II's and Partnership III's tax returns for 1959, 1962, 1963, 1964, 1965, 1966, 1967, 1968, 1969, and 1972. Respondent also audited petitioners' tax return for 1977. During these audits, revenue agents were shown the District Director's letter of September 11, 1959. Respondent did not propose any changes to the method of inventory valuation in any of these audits.

Partnership II reported on its tax return for the fiscal year ending September 30, 1954, a closing inventory of $100,783.97. The manufacturing cost of this closing inventory was $689,185.80.

As of December 31, 1977, Publisher had books of 2,124 titles in its inventory. Of these, the books of 519 titles were carried on Publisher's closing inventory at a value of one-fourth their manufacturing cost; the inventory value of the remaining 1,605 titles had been written off as of December 31, 1977.

As of December 31, 1978, Publisher had books in its inventory of 2,195 titles. Of these, the books of 437 titles were carried on Publisher's closing inventory at a value of one-fourth their manufacturing cost; the inventory value of the books of the remaining 1,758 titles had been written off as of December 31, 1978.

On Schedule C of their 1978 income tax return, petitioners reported, for 1978, an opening inventory of $789,855, and a closing inventory of $761,145. On their 1978 tax return, petitioners stated that they valued Publisher's inventory at cost, and not at lower of cost or market.

The manufacturing cost of Publisher's 1978 closing inventory was $5,418,452. Of the $4,657,307 by which the manufacturing cost exceeded the amount reported on petitioners' 1978 tax return, $190,316 is attributable to Publisher's 1978 inventory writedowns and the remaining $4,466,991 is attributable to Publisher's pre-1978 inventory writedowns. The manufacturing cost of Publisher's 1978 opening inventory was $5,256,846.[2]

In the notice of deficiency, respondent determined that Publisher's $5,418,452 1978 closing inventory manufacturing cost was the lower of cost or market.

### Personal Service Income

Thomas spent his entire working life with Publisher. During 1978, Thomas was responsible for soliciting manuscripts, determining which manuscripts would be published, determining when and how bills of Publisher would be paid, pricing all books, and determining how books would be advertised.

As of the end of 1978, Publisher had depreciable assets with an original aggregate cost of $600,341, less depreciation aggregating $440,986, for a net of $159,355.

As a result of three of the notice of deficiency adjustments that petitioners have conceded, but without regard to the disputed inventory adjustments, Thomas' net profit from Publisher is increased to $54,724.

In the course of Publisher's business, Thomas incurred $58,141 interest expense for 1978. For 1978, all of Publish-

---

[2]Respondent has not explained in the notice of deficiency, nor in his brief, how he calculated the opening and closing inventory costs for 1978 of $5,256,846 and $5,418,452, respectively. These figures differ from the manufacturing costs reflected in the stipulated inventory records of Publisher. These records show manufacturing costs for 1978 opening and closing inventory of $5,463,419 and $5,501,790, respectively. On brief, respondent noted the discrepancy between his figures and the inventory records and pointed out that his figures result in a lower deficiency than the deficiency that would be computed using the figures from the inventory records. A lower overall deficiency results using respondent's figures because respondent's figure for the ending 1978 inventory is lower than the figure indicated on the inventory records. Although the 1978 regular inventory adjustment would be less if based on the inventory records, the sec. 481(a) adjustment would be significantly greater under the inventory records. As a result, the net amounts attributable to inventory writedowns before and during 1978 would be greater if calculated using the inventory records. Respondent specifically declined to use the figures from the inventory records and relies on the numbers as reflected in the notice of deficiency. Since petitioners have not disputed the correctness of respondent's manufacturing cost figures for 1978 opening and closing inventory, and respondent's figures work somewhat to petitioners' advantage, we will use respondent's figures to reflect Publisher's inventory cost for 1978 opening and closing inventory.

er's gross receipts were derived from publishing and book sales.

On petitioners' joint 1978 income tax return, they reported $38,987 as Thomas' net profit from Publisher. Petitioners claimed a capital gain deduction of $156,986 arising from the sales of various property before July 1, 1978, and reported this amount on their 1978 tax return Form 4625 as their total of tax preference items. As a result of two of the notice of deficiency adjustments that petitioners have conceded, petitioners' total tax preference items are reduced to $154,900.

### Marye's Hill Farm

On January 4, 1971, Thomas' mother gave Marye's Hill Farm (hereinafter sometimes referred to as Marye's Hill) to Thomas. Marye's Hill is in Curran Township, Sangamon County, Illinois, southwest of Springfield. Thomas' parents bought Marye's Hill about 1940. Thomas' mother continued to live at Marye's Hill until 1 month before her death in November 1975.

For about 9 years before May 1, 1972, Thomas, his then wife, and their children resided in Fort Lauderdale, Florida. On May 1, 1972, Thomas, his then wife, and their children moved to 10 Island Bay Lane, Springfield, Illinois. The property in which Thomas and his family had been living in Florida was sold about August 1972, and Thomas did not then own any property in Florida.

On May 3, 1973, Thomas divorced his then wife. Thomas married his present wife, petitioner Joan M. Thomas, on June 14, 1973. Immediately after petitioners married each other, they began to live at 302 East Lawrence, Springfield, Illinois (hereinafter sometimes referred to as East Lawrence). Petitioners' house at East Lawrence was a small, one-bedroom house. Petitioners did not own East Lawrence; they rented it. East Lawrence was across the street from Thomas' Publisher office. Petitioners lived at East Lawrence part of the week and at Marye's Hill with Thomas' mother part of the week for about a year after their wedding. In general, they stayed at Marye's Hill in good weather; when it was bad, they generally stayed in East

Lawrence, because the latter home was more convenient for Thomas.

In early 1974, after petitioners' daughter was born, petitioners and their children (evidently from prior marriage(s)) moved into Marye's Hill, living with Thomas' mother. At Marye's Hill there was a large 14-room house, an adjacent house for a tenant-manager, an outdoor pool, and stables.

In 1975, petitioners bought a lot at the Ocean Reef Club in Key Largo, Florida. From the time of their wedding until 1975, petitioners had not owned any property in Florida. Petitioners and their children moved to Florida on December 1, 1975. After moving to Florida, petitioners and their children lived in an apartment in Key Largo while their home (hereinafter sometimes referred to as Ocean Reef) was being built on the lot bought in 1975.

Petitioners' Ocean Reef home contained 1,200 square feet, with 5 rooms and 2 baths; it was much smaller than Marye's Hill. Petitioners and their children occupied Ocean Reef from November 6, 1976, to April 13, 1977, when they returned to Marye's Hill. Petitioners and their children lived at Marye's Hill from April 13, 1977, until October 24, 1977. Petitioners sold Ocean Reef on November 7, 1977.

On October 24, 1977, petitioners bought and occupied a home in Coral Gables, Florida (hereinafter sometimes referred to as Coral Gables), of about the same size as Marye's Hill.

During the times that petitioners and their children lived in Ocean Reef and Coral Gables, Marye's Hill was neither rented, nor leased, but was maintained full time by a housekeeper, and was watched over by a tenant-manager. Petitioners did not move any furniture from Marye's Hill to Ocean Reef, nor to Coral Gables (before petitioners sold Marye's Hill). Until petitioners sold Marye's Hill, they kept their pets (three dogs, two cats, and four or five horses) at Marye's Hill. During the times that petitioners lived in Ocean Reef and Coral Gables, Thomas returned to his Publisher office in Springfield, Illinois, about every 3 weeks and stayed at Marye's Hill during those returns. Petitioners and their children lived in Coral Gables during the winter of 1977-78.

In February 1978, petitioners learned that they would have to pay additional income tax of about $180,000 for 1977. As a result of owing more tax than anticipated, plus other debts, petitioners put Marye's Hill and Coral Gables up for sale at the same time. Marye's Hill was sold after 4 days on the market. By written contract dated May 30, 1978, petitioners sold Marye's Hill for $353,000; the closing occurred on June 30, 1978. On the sale of Marye's Hill, petitioners paid a sales commission of $17,650. Petitioners realized a gain of $181,142 on the sale of Marye's Hill.

After they sold Marye's Hill, petitioners took Coral Gables off the market and moved their furniture and their cats and dogs from Marye's Hill to Coral Gables; they sold the horses that they had kept at Marye's Hill.

During the period of June 1973 through December 1978, Thomas' sole business location was in Springfield, Illinois. (For a period including the late 1960s and ending in 1972, Thomas had maintained his Publisher editorial office in Fort Lauderdale, Florida, even though all his other Publisher operations were in Springfield, Illinois.) Petitioner Joan M. Thomas was a registered voter in Illinois from 1973 through 1978, contributed to, and attended the church in Springfield, Illinois, in which petitioners had married, and had only an Illinois driver's license during this period. One of petitioners' children attended school in Chatham, Illinois (in Sangamon County), part of the time (reflecting petitioners' travels between Florida and Illinois) during the school years of 1974 through 1978. For 1973 through 1977, petitioners filed Illinois State income tax returns as full-year residents. For 1978, petitioners filed an Illinois State income tax return as part-year residents.

––––––––––

Publisher's method of accounting for inventory did not clearly reflect income.

Marye's Hill was petitioners' principal residence at the time they sold it.

## OPINION

## I. *Inventory*

Respondent contends that Publisher's method of inventory valuation does not clearly reflect income. Respondent asserts that, in order to clearly reflect income, Publisher must value inventory at the lower of cost or market, which in the instant case is cost. Respondent states this revaluation of Publisher's inventory from (one-fourth 1000-day to lower of cost or market) constitutes a change in Publisher's method of accounting. Respondent further maintains that this change in method of accounting requires a redetermination of petitioners' 1978 income under the new method of accounting, and requires an adjustment under section 481 in order to avoid omission of income from years before 1978.[3] Respondent also asserts that petitioners may not exclude from the section 481 adjustment any amounts attributable to years before the 1954 Code.

Petitioners contend that respondent has specifically approved Publisher's method of valuing inventory, and that respondent is estopped from changing this method. Petitioners also contend that their method of valuing inventory clearly reflects income. Alternatively, petitioners maintain that if Publisher's method of valuing inventory is erroneous and requires adjustment, then respondent erred in revaluing inventory by failing to make necessary adjustments attributable to years before the 1954 Code, as required under section 481.

We agree with respondent.

## A. *Proper Reflection of Income*

Section 446(a)[4] provides the general rule that taxable

---

[3]In the notice of deficiency, respondent used a shortcut to determine the adjustment; that is, respondent determined that petitioners' income was to be increased by $4,657,307—the amount by which Publisher's 1978 closing inventory manufacturing cost ($5,418,452) exceeded the 1978 closing inventory amount shown on petitioners' 1978 tax return ($761,145). As we note, *infra* (and as respondent concedes on opening brief), the proper method would have been to (1) make the same modification in 1978 opening inventory that was made in 1978 closing inventory, and (2) to determine an adjustment under sec. 481. This is explained in *Dearborn Gage Co. v. Commissioner*, 48 T.C. 190, 197 (1967). The parties' analyses, and ours, focus on the issues under sec. 481, as well as those under secs. 446 and 471.

[4]SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

income is to be computed using the method of accounting under which the taxpayer regularly computes income in keeping the taxpayer's books. The term "method of accounting" includes the overall method of accounting used by the taxpayer as well as the accounting treatment of any material item. Sec. 1.446-1(a)(1), Income Tax Regs. A method of accounting is not acceptable unless it clearly reflects income. Sec. 446(b);[5] sec. 1.446-1(a)(2), Income Tax Regs.[6]

In addition to the clear reflection of income requirements of section 446, inventory accounting for Federal tax purposes is governed by section 471[7] and the regulations promulgated thereunder. *Primo Pants Co. v. Commissioner*, 78 T.C. 705, 717 (1982). As a publisher and seller of books, Publisher was required to use inventories and to use the accrual method of accounting for purchases and sales as its overall method of accounting. Secs. 1.446-1(c)(2) and 1.471-1, Income Tax Regs. Publisher kept inventories and used the accrual method of accounting. Section 471 and section 1.471-2(a), Income Tax Regs.,[8] provide two tests, both of which must be met in order for a method of inventory valuation to qualify. The method of inventory valuation

[5]SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

[6]Sec. 1.446-1. General rule for methods of accounting.

(a) *General rule.* * * *

(2) It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income. A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

[7]SEC. 471. GENERAL RULE FOR INVENTORIES.

Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

[The subsequent amendments of sec. 471 (by sec. 803(b)(4) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2356) do not affect the instant case.]

[8]Sec. 1.471-2. Valuation of inventories.

(a) Section 471 provides two tests to which each inventory must conform:

(1) It must conform as nearly as may be to the best accounting practice in the trade or business, and

(2) It must clearly reflect the income.

both (1) "must conform as nearly as may be to the best accounting practice in the trade or business", and (2) must "clearly reflect the income." *Thor Power Tool Co. v. Commissioner,* 64 T.C. 154, 165 (1975), affd. 563 F.2d 861, 865-866 (7th Cir. 1977), affd. 439 U.S. 522, 532 (1979).

Petitioners do not contend that Publisher's inventory method conforms with "the best accounting practice in the trade or business" and there is no evidence in the record in the instant case as to accounting practices in the book publishing trade or business. However, respondent has not challenged Publisher's inventory accounting practice on that score, and so petitioners should not be faulted for failing to show that they meet the first of the above-noted requirements.

We move to the second of the section 471 tests, that Publisher's inventory accounting method must clearly reflect Publisher's income. We conclude, and we have found, that the inventory accounting method did not clearly reflect the income.

In determining a business' gross income, cost of goods sold is subtracted from gross sales. See sec. 1.61-3(a), Income Tax Regs. In determining a business' cost of goods sold, closing inventory is subtracted from the sum of opening inventory and cost of goods manufactured. A valuation method which assigns lower costs to closing inventory increases cost of goods sold, and thereby reduces gross income. See *Peninsula Steel Products & Equip. v. Commissioner,* 78 T.C. 1029, 1053 (1982).

The only evidence presented by petitioners to justify the inventory writedowns is the testimony[9] of Thomas, who stated as follows at the conclusion of his direct testimony:

Q. [Morris] The nature of your publications creates rapid obsolescence of those various publications, doesn't it?

A. [Thomas] We've determined that we sell 56 percent of our books within the first year and 83 percent within three years. That is everything that we're going to sell; that doesn't mean everything that we've printed. 83 percent of what we're going to sell, we sell in the first three years.

---

[9]The Supreme Court has stated that, in the absence of "providing evidence of actual offerings, actual sales, or actual contract cancellations * * * a taxpayer's *assertions* as to the 'market value' of its inventory are not cognizable in computing its income tax." *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 535 (1979). Emphasis supplied.

Q. I'm sorry. I don't believe I understood you. You said you sold how many of the books in the first three years?

A. In the first year, we've determined that we sell 56 percent, as I recall, of everything that we're going to sell.

Q. All right, sir.

A. Within three years, we have sold 83 percent of everything that we will eventually sell. But that's not 83 percent of what we've printed.

Q. All right, sir. If it isn't 83 percent of what you printed, then what are you not mentioning here.

A. The balance of the books have been destroyed. After four years, I believe that we determined that we had sold 39 percent of the books that we had printed at the end of 1978. We had destroyed 56 percent of those books. We still had 5 percent on hand. That totals 100 percent of the books printed.

Q. So that in that four-year period then, any profit that you were to make would have had to come from the 39 percent that were sold. Is that correct?

A. That's correct. There were still 5 percent left, and we could probably sell some of those, possibly on our anniversary offer, at a 60 percent discount. Some of them will probably be destroyed.

Q. All right, sir. Then if for example you have a dollar, representing a dollar of manufacturing costs.

A. That's correct.

Q. All right. And you sell 39 percent of that, or 39 cents?

A. We sell 39 percent. We can expect to get back 39 percent of that dollar. But then we have determined that we don't sell all of those books at the full retail price; we only get 84 percent of the retail price. So if you're trying to determine what you're getting back on your original manufacturing dollar, you have to multiply 39 percent times 84 percent times 83 percent.

Q. To find the return.

A. And it's about 27 cents that you've actually gotten back of your manufacturing dollar, which is about 1/4 of manufacturing. That's within three years, I believe.

A. All right, sir. Thank you.

This testimony does not support a writedown to one-fourth manufacturing cost immediately and to zero after 2 years, 9 months. For example, assume that in year 1, Publisher printed 1,000 books at a manufacturing cost of $1 each (for total manufacturing cost of $1,000), and that Publisher's retail price is $4 per book.[10] According to Thomas' testimony, he would expect to sell only 390 of these books, at an average price of $3.36 each (84 percent of the $4 retail price), generating total sales revenue of $1,310.04. Even if

[10]Publisher's retail price for its books generally was four to five times the books' manufacturing cost.

all the 610 remaining books were to be destroyed, the value of the 1,000 books is greater than their manufacturing cost. Yet, under Publisher's inventory accounting method the 1,000 books would have been immediately entered into inventory at a value of only $250, far below the expected receipts from sales of the books. The result of Publisher's immediate 75-percent writedown is to attribute to Year 1 much of the manufacturing cost of books that Publisher expected to sell in later years.

Also, if indeed Publisher's books were promptly destroyed after 2 years, 9 months, then they would not appear in Publisher's closing inventory after year 3. Yet we have found that more than three-fourths of the December 31, 1977, inventory titles (1,605 out of 2,124) and more than four-fifths of the December 31, 1978, inventory titles (1,758 out of 2,195) consisted of books that had been completely written off. The result of Publisher's write-off after 2 years, 9 months is to attribute to year 3 a portion of the manufacturing cost of the books that Publisher expected to sell in later years.

Thus, Publisher's inventory accounting system produced each year a mismatch of deductions and receipts, with the deductions always preceding the receipts.

When the books are ultimately sold or destroyed, then the distortion attributable to year 1's book production would be undone (see the detailed explanation of this process in *Primo Pants Co. v. Commissioner,* 78 T.C. at 723-724), but, under Publisher's method, some part of that distortion would remain until the last book's sale or destruction. Of course, in the meanwhile, Publisher (hence, Thomas) would have had the benefit of an interest-free loan from the Federal Treasury, to the extent of the taxes on the outstanding mismatch. The distorting interest-free loan effect would never be undone.

This process repeated itself each year, with each year's mismatch being added to the as-yet-uncorrected portions of the earlier years' mismatches. We have found that the manufacturing cost of Publisher's 1978 closing inventory was $4,657,307 more than the closing inventory amount reported on petitioners' 1978 tax return. Of this amount, only $190,316 is attributable to Publisher's 1978 inventory

writedowns, while the remaining $4,466,991 is attributable to Publisher's pre-1978 inventory writedowns that had not yet been corrected by the sale or destruction of the previously written-down books. See note 2, *supra.* These excess writedowns distorted Publisher's income. Consequently, we conclude that Publisher's method of inventory valuation did not clearly reflect income. See *Thor Power Tool Co. v. Commissioner,* 64 T.C. at 173.[11]

If a taxpayer's method of accounting does not clearly reflect income, then the taxpayer's taxable income is to be computed under a method of accounting that respondent chooses that does clearly reflect the taxpayer's income (sec. 446(b); see note 5, supra) including a proper method of accounting for inventories, section 471. (See note 7, *supra.*) Respondent has broad discretion in determining whether an accounting method clearly reflects income. *Commissioner v. Hansen,* 360 U.S. 446, 467 (1959). See *Peninsula Steel Products & Equip. v. Commissioner,* 78 T.C. at 1044. Even though an accounting method may be in accordance with generally accepted accounting principles, the requirement that the accounting method clearly reflect income is paramount. *Thor Power Tool Co. v. Commissioner,* 439 U.S. at 538-544.

In the instant case, respondent determined that Publisher's method of accounting was erroneous; in its place, respondent used the "lower of cost or market method" authorized by sections 1.471-2(c) and 1.471-4, Income Tax Regs., and determined the lower of cost or market to be cost. Petitioners did not present any evidence showing that

---

[11]As is made clear in *Thor Power Tool Co. v. Commissioner,* 64 T.C. 154, 169 (1975), affd. 563 F.2d 861, 869 (7th Cir. 1977), affd. 439 U.S. 522 (1979), the method of valuing inventory at the lower of cost or market is "a limited and acceptable exception to the principles of annual *accounting which otherwise would preclude recognition of an unrealized loss."* Petitioners do not contend on brief that the results of Publisher's inventory accounting method is permissible under the lower of cost or market approach. If they had so claimed, then we would have held that they had failed to carry their burden of proving that the market value of Publisher's 1978 closing inventory was lower than the manufacturing cost of that inventory. As to excess copies of books in Publisher's inventory, we adopt the Supreme Court's comment in *Thor Power Tool Co. v. Commissioner,* 439 U.S. at 545—

"Thor, quite simply, has suffered no present loss. It deliberately manufactured its 'excess' spare parts because it judged that the marginal cost of unsalable inventory would be lower than the cost of retooling machinery should demand surpass expectations. This was a rational business judgment and, not unpredictably, Thor now has inventory it believes it cannot sell. Thor, of course, is not so confident of its prediction as to be willing to scrap the 'excess' parts now; it wants to keep them on hand, just in case. This, too, is a rational judgment, but there is no reason why the Treasury should subsidize Thor's hedging of its bets. * * *"

respondent abused his discretion under section 446(b) and section 471 by revaluing Publisher's inventory. We conclude that respondent did not abuse his discretion under section 446(b) and section 471 by revaluing Publisher's inventory.

On brief, petitioners continue to rely on Thomas' explanation of why Publisher's method is justified, focusing on the following portion:

A. * * * So if you're trying to determine what you're getting back on your original manufacturing dollar, you have to multiply 39 percent times 84 percent times 83 percent.

Q. To find the return.

A. And it's about 27 cents that you've actually gotten back of your manfuacturing dollar, which is about 1/4 of manufacturing. * * *

A moment's reflection will show the basic errors of this analysis. Firstly, the 84-percent amount derives from testimony that, because of various discounts, Publisher's average actual sale price is 84 percent of Publisher's *listed sales price,* which in turn is generally four to five times Publisher's manufacturing cost. Thus, if Thomas' testimony as to percentages is accurate, and if his analysis is at all meaningful, then it shows that Publisher's inventory is worth 27 percent of Publisher's listed sales price—probably 108 to 135 percent of Publisher's manufacturing cost. Secondly, Publisher could not have stayed in business more than half a century if, throughout its history, its gross receipts were only about 27 percent of its manufacturing costs. (We assume that petitioners are not intending to imply the old saw of "losing a little on each sale but making it up in volume.") Thirdly, we fail to understand how the 83-percent amount (83 percent of total sales are made within 3 years of publication) is related to a determination of the value of the inventory immediately after publication.

Petitioners argue that Publisher's method of valuing inventory at one-fourth manufacturing cost immediately on publication and at zero after 2 years, 9 months, was specifically approved under section 1.446-1(c)(2)(ii), Income Tax Regs., by respondent in a letter issued by respondent's District Director in September 1959 to Partnership II. Petitioners maintain that, "on the basis of that approval,

[Publisher's method of inventory accounting] could continue to be used in the future and cannot now be changed."

We disagree.

We addressed the issue of what constitutes specific approval under section 1.446-1(c)(2)(ii),[12] Income Tax Regs., in *Pierce Ditching Co. v. Commissioner,* 73 T.C. 301 (1979). In *Pierce Ditching,* the taxpayer used the cash method of accounting except that it accrued as a deduction bonuses for its employees determined at yearend and paid within 1½ months after the close of the year. Respondent audited the taxpayer for several years and did not make adjustments. In one of the audited years respondent's agent in an examination report proposed to change taxpayer's method of accounting to accrual for all items of income and expense. When the examining agent's report was reviewed, respondent accepted the methods of accounting used by the taxpayer in reporting its income and expenses (including salaries and wages). Then respondent audited the taxpayer again, for later years, and proposed to change the taxpayer's method of accounting with respect to salaries and wages. In defense to this later audit, the taxpayer argued that its method of accounting had been specifically approved by respondent. We rejected the taxpayer's argument and held that respondent's actions did not constitute specific approval of the taxpayer's method of accounting. In so holding, we stated as follows (73 T.C. at 305-306):

Certainly, some positive act on the part of respondent is required for this Court to find that the Commissioner has exercised the authority granted him in section 1.446-1(c)(2)(ii), Income Tax Regs. The fact that

---

[12]Sec. 1.446-1(c)(2)(ii), Income Tax Regs., provides as follows:

Sec. 1.446-1. General rule for methods of accounting.

(c) *Permissible methods—*

　　　　*　　*　　*　　*　　*　　*　　*

(2) *Special rules.*

　　　　*　　*　　*　　*　　*　　*　　*

(ii) No method of accounting will be regarded as clearly reflecting income unless all items of gross profit and deductions are treated with consistency from year to year. The Commissioner may authorize a taxpayer to adopt or change to a method of accounting permitted by this chapter although the method is not specifically described in the regulations in this part if, in the opinion of the Commissioner, income is clearly reflected by the use of such method. Further, the Commissioner may authorize a taxpayer to continue the use of a method of accounting consistently used by taxpayer, even though not specifically authorized by the regulations in this part, if, in the opinion of the Commissioner, income is clearly reflected by the use of such method. * * *

respondent's agent examined petitioner's income tax returns for tax year 1971 and 1972 without proposing any change in method is not, without more, such a positive act. *This is true even if respondent's agent had been made aware of, or even approved, petitioner's erroneous method. EZO Products Co. v. Commissioner,* 37 T.C. 385, 391 (1961). [Emphasis supplied.]

In the instant case, the District Director's letter includes a copy of the examining officer's report. This report states that the examining officer accepted Partnership II's method of inventory valuation as reasonable and substantially correct. The District Director's letter does not indicate any specific adoption of the examining officer's report but encloses the report for Thomas' own information. Neither the covering letter nor the examining officer's report states that respondent was thereby authorizing (or otherwise had authorized) a method "not specifically described in the regulations in this part" or "not specifically authorized by the regulations in this part" under the authority of section 1.446-1(c)(2)(ii), Income Tax Regs. Rather, the examining officer's report described Publisher's method as Publisher's "estimate of their [i.e., the books in Publisher's inventory] fair market value, being lower than cost." This, of course, is the "cost or market, whichever is lower" method, specifically authorized by section 1.471-2(c)(2), Income Tax Regs. We have already concluded that Publisher did not correctly use the cost-or-market method (see note 11, *supra*) and we have found that what Publisher did distorted its income. *Thor Power Tool Co. v. Commissioner, supra.* Respondent is not bound by the examining officer's report. *Pierce Ditching Co. v. Commissioner,* 73 T.C. at 306. We conclude that the District Director's letter did not constitute specific approval of Publisher's method of inventory valuation.[13]

Even if we were to find that the District Director's letter constituted specific approval in 1959 of Publisher's method

---

[13]We note that petitioners have not explained whether specific approval of a partnership's method of accounting transfers over to a sole proprietorship's method of accounting when the partnership dissolves and the business is operated as a sole proprietorship. We express no opinion on this issue. However, it is interesting to note that the 1959 report, on which petitioners rely for this and other issues, may be read as taking the position that Partnership II was not the same taxpayer as Partnership I for purposes of consistent use of the inventory valuation method. The report states that the partnership was organized in 1946 and followed this inventory valuation method consistently. The parties have stipulated that Partnership I also consistently followed the same method.

of inventory valuation for 1957 and 1958, respondent is not prevented from changing Publisher's method for later years because that method did not clearly reflect Publisher's income. E.g., *Thor Power Tool Co. v. Commissioner*, 439 U.S. at 531-538; *Ezo Products Co. v. Commissioner*, 37 T.C. 385, 391 (1961); *Klein Chocolate Co. v. Commissioner*, 36 T.C. 142, 147 (1961). The requirement that a method of accounting clearly reflect income is found in several parts of the Code and regulations. See secs. 446(b) and 471, and secs. 1.446-1(b)(1), 1.446-1(c)(2)(ii), and 1.471-2(a)(2), Income Tax Regs. The regulations promulgated under section 446 state that "no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income." Sec. 1.446-1(a)(2), Income Tax Regs. In *Thor Power Tool Co. v. Commissioner*, 439 U.S. at 532, the Supreme Court stated as follows:

> It is obvious that on their face, secs. 446 and 471, with their accompanying Regulations, vest the Commissioner with wide discretion in determining whether a particular method of inventory accounting should be disallowed as not clearly reflective of income. This Court's cases confirm the breadth of this discretion. In construing sec. 446 and its predecessors, the Court has held that "The Commissioner has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." *Commissioner v. Hansen*, 360 U.S. 446, 467 (1959). Since the Commissioner has "Much latitude for discretion," his interpretation of the statute's clear-reflection standard "should not be interfered with unless clearly unlawful." *Lucas v. American Code Co.*, 280 U.S. 445, 449 (1930). * * *

Under section 1.446-1(c)(2)(ii), Income Tax Regs., respondent may authorize a taxpayer to adopt or change to a method of accounting not specifically described in the regulations if, in respondent's opinion, income is clearly reflected by the use of that method. Although respondent has wide discretion under section 446, he does not have the power to require a taxpayer to change from a method of accounting which does not clearly reflect income to another method which does not clearly reflect income. *Rotolo v. Commissioner*, 88 T.C. 1500, 1522-1524 (1987). Where a taxpayer has consistently followed a method of accounting which clearly reflects income, respondent is not permitted to require a change in that method of accounting. *Van Pickerill & Sons, Inc. v. United States*, 445 F.2d 918 (7th Cir. 1971);

*Hallmark Cards, Inc. v. Commissioner,* 90 T.C. 26, 34-35 (1988), and cases there cited.

In the instant case, petitioners' method of accounting does not clearly reflect income. If under section 1.446-2(c)(ii), Income Tax Regs., respondent approved this erroneous method of accounting, we do not believe that his "hands are tied and he is required to perpetuate error." *Klein Chocolate Co. v. Commissioner,* 36 T.C. at 147. To bar respondent from changing an erroneous method of accounting, which he approved, would allow petitioners to continue distorting their income in future taxable years. Section 446(b) and the regulations thereunder are intended to give respondent broad power to ensure that a taxpayer's method of accounting clearly reflects income. To hold that respondent is prohibited from requiring a taxpayer to change from an erroneously approved accounting method to an accounting method which clearly reflects income would defeat the purpose and importance of the statutes' requirement, in section 446(b), that the method of accounting "clearly reflect income". See *Thor Power Tool Co. v. Commissioner,* 439 U.S. at 538-543.

We will not accept petitioners' invitation to convert respondent's 1959 error into a permanent license to distort petitioners' income.

Petitioners further contend that the principles espoused in *Thor Power Tool Co. v. Commissioner, supra,* do not apply because they consistently used their method of valuing inventory since 1927, and this method clearly reflects income. Additionally, petitioners assert that respondent is estopped from changing Publisher's inventory method because Publisher has relied on the District Director's letter since 1959, as a basis for using this method. In making this latter contention, petitioners maintain that detrimental reliance exists in that, if respondent's revaluation of inventory is upheld, then petitioners would be faced with a tax increase of more than $3.2 million.

We disagree with petitioners' contentions.

In *Ezo Products Co. v. Commissioner,* 37 T.C. at 391, we stated as follows:

Where respondent has accepted over a long period of years or approved a method of accounting by a taxpayer, this fact will be given weight in

determining whether respondent was justified in changing the method used by such taxpayer. *Geometric Stamping Co.,* 26 T.C. 301 (1956). *Respondent's authority to order a change in accounting method when the taxpayer has regularly employed a consistent method depends upon the validity of his finding that the taxpayer's method does not clearly reflect income. Glenn v. Kentucky Color & Chemical Co.,* 186 F.2d 975 (C.A. 6, 1951). However, respondent is not estopped from computing a taxpayer's income on an accrual method of accounting because of the fact that he has examined prior returns without objection to the method used by the taxpayer. *Caldwell v. Commissioner,* 202 F.2d 112 (C.A. 2, 1953), affirming a Memorandum Opinion of this Court. [Emphasis supplied.]

Having found that Publisher's method of inventory valuation did not clearly reflect income, we conclude that respondent is not estopped from changing Publisher's method to a new method which clearly reflects income. *Burlington Northern Railroad v. Commissioner,* 82 T.C. 143, 145-146 (1984), and cases there cited. The cases cited by petitioners in support of their arguments do not assist them. Petitioners rely on *Milwaukee Valve Co. v. Commissioner,* T.C. Memo. 1958-164.[14] In *Milwaukee Valve,* we stated as follows: "The Commissioner has moved for judgment in favor of the [taxpayer] on the pleadings." 17 T.C.M. 811, 27 P-H Memo. T.C. par. 58,164. Respondent conceded that he erred in revaluing the taxpayer's inventory where the taxpayer consistently used a method of inventory valuation for at least 15 years and that method (respondent conceded) clearly reflected income. In light of respondent's concessions, we granted his motion. In the instant case, we have concluded that Publisher's method of inventory valuation does not clearly reflect income. Although consistent usage of a method by Publisher, coupled with favorable consideration by respondent on prior audits, is a factor to be taken into account (*Public Service Co. of N.H. v. Commissioner,* 78 T.C. 445, 456 (1982)), it does not prevent respondent from correcting the error. *Burlington Northern Railroad v. Commissioner,* 82 T.C. at 146; *Coors v. Commissioner,* 60 T.C. 368, 395 (1973), and cases there cited, affd. sub nom. *Adolph Coors Co. v. Commissioner,* 519 F.2d 1280 (10th Cir. 1975).

---

[14]As to the precedential value of Memorandum Opinions, see, e.g., *Newman v. Commissioner,* 68 T.C. 494, 502 n. 4 (1977).

Petitioners' reliance on *Union Equity Cooperative Exchange v. Commissioner,* 481 F.2d 812 (10th Cir. 1973), affg. 58 T.C. 397 (1972), in support of their estoppel argument is also misplaced. In *Union Equity,* the Court of Appeals for the 10th Circuit stated, 481 F.2d at 817, that "it is well established that the Commissioner is not estopped from challenging erroneously reported items where Internal Revenue agents have failed in prior years to challenge similarly erroneous reported items." Quoting from a previous Court of Appeals decision, the Court of Appeals further stated as follows (481 F.2d at 817):

neither the duty of consistency, nor the principle of equitable estoppel bind the Commissioner to unauthorized acts of his agents * * * nor preclude him from correcting mistakes of law * * * *including the power to retroactively correct his rulings, regulations and decisions upon which taxpayers have relied.* [Emphasis supplied.]

Thus, the *Union Equity* opinion that petitioners rely on supports respondent's actions in changing petitioners' method of inventory valuation to clearly reflect income.

Finally, in response to petitioners' argument that they will suffer a detriment in having to pay $3.2 million in taxes, we believe that instead of suffering any detriment, petitioners have been benefited financially by respondent's past actions in permitting Publisher to value inventory at one-fourth manufacturing cost and later at zero. By doing so, the recognition of millions of dollars of income has been deferred to later years. This is well illustrated in *Fruehauf Trailer Co. v. Commissioner,* 42 T.C. 83, 98 (1964), affd. 356 F.2d 975 (6th Cir. 1966). As we stated in *Union Equity Cooperative Exchange v. Commissioner,* 58 T.C. at 408, "The mere fact that petitioner may have obtained a windfall in prior years does not entitle it to like treatment for the taxable year here in issue".

We hold for respondent on this issue.

## B. *Opening Inventory and Section 481 Adjustment*

Since respondent properly revalued Publisher's 1978 closing inventory, and this constituted a change in Publisher's accounting method, it follows that Publisher's 1978 opening inventory must be revalued on a consistent basis in order to

clearly reflect income for 1978. *Primo Pants Co. v. Commissioner,* 78 T.C. at 725, and the cases cited therein.

The notice of deficiency increased closing inventory for 1978 from the $761,145 figure reported on petitioners' tax return to $5,418,452, for an increase of $4,657,307. Since the notice of deficiency did not increase opening inventory for 1978, the total notice of deficiency increase in taxable income for 1978 was also $4,657,307. The opening inventory is to be adjusted to $5,256,846. (See note 2, *supra.*) This increase in opening inventory results in an increase in petitioners' 1978 taxable income of $190,316, rather than the increase of $4,657,307 shown on the notice of deficiency. In the absence of any adjustment under section 481, an amount of $4,466,991 of taxable income resulting from excess inventory writedowns before 1978 will escape taxation.[15] Section 481(a)[16] provides that, if a taxpayer computes taxable income for a taxable year under a method of accounting different from the method of accounting under which the taxpayer computed taxable income in the preceding year, then an adjustment may be necessary to prevent amounts of income or deduction from being duplicated or omitted.

In the instant case, the change in Publisher's method of accounting resulted in amounts being omitted from taxable income. As to those books still in opening inventory on January 1, 1978, the excess writedowns in inventory for years before 1978 totaled $4,466,991. Respondent contends that section 481 requires an increase in taxable income of this amount. Petitioners do not, in terms, dispute the

---

[15]Because Publisher prematurely wrote down by $4,466,991 the inventory that Publisher still had on hand on Dec. 31, 1977, petitioners' pre-1978 taxable income was understated by the same amount. If 1978 opening inventory were to be increased by $4,466,991 without a concomitant inclusion of income of the same amount, then Publisher's deferral of taxation would be transformed into a permanent exemption.

[16]SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply [i.e., a taxable year beginning before Jan. 1, 1954, or ending before Aug. 17, 1954] unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

applicability of section 481(a) if we were to rule against them on respondent's adjustment to Publisher's 1978 closing inventory.

We agree with respondent that section 481(a) requires petitioners to include in income the amount that otherwise would be omitted in the change in the method of valuing inventory—i.e., the amount by which Publisher's revalued 1978 opening inventory exceeds Publisher's stated 1977 closing inventory, or $4,466,991.

However, petitioners contend that "In the event that the court should find against the Petitioner, the Petitioner is entitled to an adjustment attributable to years prior to 1954." The amount of this claimed pre-1954 adjustment is $588,401.83. Although they do not say so, we gather that petitioners rely on the latter half of section 481(a)(2), and its exclusion of "any adjustment in respect of any taxable year to which this section does not apply."[17] Respondent points out that the section 481(a) adjustment is made to Publisher as a sole proprietorship and, in 1954, Publisher was Partnership II. Respondent contends that the sole proprietorship and Partnership II are not the same taxpayer and so the sole proprietorship (hence, Thomas) is not entitled to the benefit of a pre-1954-Code exclusion based on Partnership II's method of accounting. Respondent does not contend that petitioners initiated the change in the method of accounting.

The latter half of section 481(a)(2) provides that if respondent initiates the change in the method of accounting, then any adjustment (negative or positive) attributable to pre-1954-Code years is to be excluded in determining the section 481 adjustment.[18] The amount of the section 481(a) adjustment is the sum of the aggregate net increase, or decrease, in the taxpayer's various account balances at the beginning of the taxable year in which the accounting method was changed.[19]

---

[17]Publisher's last taxable year before the Internal Revenue Code of 1954 is Publisher's fiscal year beginning Oct. 1, 1953, and ending Sept. 30, 1954. (See sec. 7851(a)(1)(A).) We have found that Publisher's (Partnership II's) closing inventory for that year was $100,783.97; the manufacturing cost of that inventory was $689,185.80; the claimed exclusion is the difference between these amounts.

[18]This rule is expanded on in secs. 1.481-1(a)(2), 1.481-1(c)(4), and 1.481-3, Income Tax Regs.

[19]Sec. 1.481-1(c)(1), Income Tax Regs., defines the sec. 481 adjustment as follows:

We agree with respondent that petitioners are not entitled to exclude any amounts attributable to pre-1954 Code years.

The benefits of the pre-1954-Code exclusion under section 481(a)(2) are available only to the person or entity who is the taxpayer within the meaning of section 481(a). We have denied the benefits of a section 481(a)(2) exclusion for pre-1954-Code amounts where the change in business form was from a sole proprietorship to a decedent's estate, or from a partnership to a corporation.[20] *Estate of Biewer v. Commissioner*, 41 T.C. 191 (1963), affd. 341 F.2d 394 (6th Cir. 1965); *Ezo Products Co. v. Commissioner*, 37 T.C. at 393-394. In each of these instances, the successor entity whose existence arose after 1954 was treated under section 481 as a different taxpayer from its predecessor.

In the instant case, Thomas' business went through a number of changes. From 1927 to 1946, the business was operated as a partnership with two partners. From 1946 to 1968, the business was operated as a partnership with three partners. From 1968 to 1975, the business was operated as a partnership with two partners. From 1975 to 1978, the business was operated as a sole proprietorship. Petitioners have not bothered to argue nor distinguish their situation from our decisions in *Estate of Biewer* and *Ezo Products Co.* (or from our decision in *Pittsfield Coal & Oil Co.*). The

(c)(1) The term "adjustments", as used in section 481, has reference to the net amount of the adjustments required by section 481(a) and paragraph (b) of this section. In the case of a change in the over-all method of accounting, such as from the cash receipts and disbursements method to an accrual method, the term "net amount of the adjustments" means the consolidation of adjustments (whether the amounts thereof represent increases or decreases in items of income or deductions) arising with respect to balances in various accounts, such as inventory, accounts receivable, and accounts payable, at the beginning of the taxable year of the change in method of accounting. *With respect to the portion of the adjustments attributable to pre-1954 Code years, it is immaterial that the same items or class of items with respect to which adjustments would have to be made (for the first taxable year to which section 481 applies) do not exist at the time the actual change in method of accounting occurs. For purposes of section 481, only the net dollar balance is to be taken into account. In the case of a change in the treatment of a single material item, the amount of the adjustment shall be determined with reference only to the net dollar balances in that particular account.* [Emphasis supplied.]

It appears that the effect of the emphasized portions of sec. 1.481-1(c)(1) is that, if the pre-1954-Code limitation were to apply in the instant case, then Thomas would benefit from this limitation even though it seems highly unlikely that any of Publisher's 1978 opening inventory consisted of books that were in Publisher's closing inventory on September 30, 1954. See discussion in *Dearborn Gage Co. v. Commissioner*, 48 T.C. 190, 199-200 (1967).

[20]Similarly in *Pittsfield Coal & Oil Co. v. Commissioner*, T.C. Memo. 1966-4, we denied the benefits of a sec. 481(a)(2) exclusion for pre-1954-Code amounts where the change in business form was from a sole proprietorship to a corporation.

Supreme Court has stated that a partnership is an independently recognizable entity apart from the aggregate of its partners for purposes of computing taxable income at the partnership level. *United States v. Bayse*, 410 U.S. 444, 448 (1973). In *Cottle v. Commissioner*, 89 T.C. 467, 497-500 (1987), and *Richardson v. Commissioner*, 76 T.C. 512, 526-527 (1981), affd. 693 F.2d 1189 (5th Cir. 1982), among many other cases, we discussed circumstances in which the chapter 1 income tax consequences of a transaction differed depending on whether the transaction was conducted by a partnership or directly by an individual. In both of those cases, notwithstanding that partnerships are "flow-through" entities, we rebuffed respondent's attempts to treat the partnerships as aggregates.[21]

However, in *Grogan v. United States*, 475 F.2d 15 (5th Cir. 1973), the Court of Appeals treated the partnership as an aggregate in applying the pre-1954-Code exclusion of section 481(a)(2) to a situation where a sole proprietor converted his business into a partnership. (We note that petitioners' situation is factually different from *Grogan* in that Thomas' business converted from a partnership to a sole proprietorship.)

*Travis v. Commissioner*, 47 T.C. 502 (1967), affd. in part and revd. in part 406 F.2d 987 (6th Cir. 1969), involved a situation where the taxpayer operated a business as a sole proprietorship and, during the year before the Court, incorporated the business. The taxpayer was the only shareholder of the corporation, which elected subchapter S status for its first taxable year. One of the issues in *Travis* related to the application of section 481. We held that the taxpayer was not entitled to the benefit of the section 481(a)(2) pre-1954-Code exclusion because neither the taxpayer nor the Commissioner had sought to make a section 481(a) adjustment. After holding that the taxpayer "can reap no benefit from section 481(a)(2)" for the foregoing reason (47 T.C. at 517), we stated as follows (47 T.C. at 518):

---

[21]More recently, in *Cokes v. Commissioner*, 91 T.C. 222 (1988), we pointed out how a taxpayer's chapter 2 self-employment tax could be drastically affected by whether the taxpayer was a passive direct investor or a passive partner.

It should be noted, however, that we have treated this aspect of the case as though the petitioner and the corporation, which elected subchapter S treatment for the year in issue, were the same taxable entity. This was the approach taken in *E. Morris Cox, supra,*[22] and seems sound in light of the purposes of subchapter S. If the corporation had not elected subchapter S treatment, the cash received by it with respect to accounts transferred to it by the sole proprietorship would have been includable in its income for 1958. This is because the accounts were transferred from the sole proprietorship in a tax-free exchange. The corporation therefore had the same basis in them as the sole proprietorship, which had a basis of zero. Therefore, if the corporation were a separate taxable entity it would have been required to take into income all cash received with respect to such accounts. *P.A. Birren & Son v. Commissioner,* 116 F.2d 718 (C.A. 7, 1940), and cf. *Ezo Products Co.,* 37 T.C. 385 (1961).

It has been suggested that our suggestion in *Travis* conflicts with what was held in *Weiss v. Commissioner,* 395 F.2d 500 (10th Cir. 1968), affg. T.C. Memo. 1967-125 (T. White, "Recurring and New Problems Under Subchapter S", 27th Ann. N.Y.U. Tax Inst. 755, 757-762 (1969)),[23] and *Leonhart v. Commissioner,* 414 F.2d 749 (4th Cir. 1969), affg. T.C. Memo. 1968-98 (2 J. Mertens, Law of Federal Income Tax, sec. 12.20, at 94 (1985 rev.)).

Petitioners do not claim that we should extend the principles applied in *Grogan* or discussed in *Travis.* We express no opinion as to the merits of such a claim or to what would have been the result had petitioners raised such a claim. *Concord Consumers Housing v. Commissioner,* 89 T.C. 105, 106 n. 3 (1987); *Estate of Fusz v. Commissioner,* 46 T.C. 214, 215 n. 2 (1966).

Thus far, we have not held that, for purposes of section 481(a)(2), a partnership is the same taxpayer as the individual who subsequently owns the partnership's business.

---

[22]In *Cox v. Commissioner,* 43 T.C. 448, 459 (1965), we stated, in dictum, that the Commissioner "might have argued, but did not do so" that a subch. S corporation was the same taxpayer as a predecessor partnership, for purposes of sec. 481. We went on to suggest that "Such argument would have a strong appeal in view of the underlying purpose of section 481, * * * However, he made no such contention, and we express no opinion as to its merits."

[23]Professor White concluded that "The result in *Weiss,* that a Subchapter S election does not change the identity of the taxpayer [i.e., if a subch. C corporation elects subch. S, and a sec. 481(a) adjustment is sought to be made for the corporation's first year under subch. S, then the subch. C corporation is the "same taxpayer" as the subch. S corporation] for Section 481 purposes, seems inconsistent with the result in *Travis,* although both can be justified by arguments drawn from the purpose or effect of Subchapter S. *Weiss* seems to be correct, and *Travis* not". T. White, "Recurring and New Problems Under Subchapter S", 27th Ann. N.Y.U. Tax Inst. 755, 761-762 (1969).

Petitioners have failed to persuade us that we should do so in the instant case.

We hold for respondent on this issue.

## II. *Personal Service Income*

Petitioners contend that, if we hold for respondent on the inventory valuation issue, then the resulting increase in income would constitute personal service income and be subject to a maximum tax of 50 percent under section 1348.

Respondent contends that petitioners are not eligible for the benefits under section 1348 because (1) Publisher used capital as a material income-producing factor and, as a result, Thomas' personal service income was limited to a reasonable amount not to exceed 30 percent of Publisher's net profits; (2) petitioners failed to present any evidence as to what is reasonable compensation for the services Thomas rendered; and (3) Thomas' reasonable compensation would have to exceed $200,000 before petitioners would benefit under section 1348.

We agree with all three of respondent's contentions.

Section 1348(a)[24] provides that the marginal tax rate applicable to an individual's personal service taxable income is not to exceed 50 percent. "Personal service taxable income" is defined in section 1348(b)(2) as personal service income reduced by (1) certain related deductions allowable under section 62, (2) a proportionate share of itemized deductions and personal exemptions, and (3) the sum of the taxpayer's items of tax preference. "Personal service income" is defined in section 1348(b)(1), with exceptions not here relevant, as "any income which is earned income within the meaning of section * * * 911(b)".[25] If capital is a

---

[24]Sec. 1348 was repealed for taxable years beginning after Dec. 31, 1981, by sec. 101(c)(1) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 183 (effective date sec. 101(f)(1), 95 Stat. 185).

[25]Sec. 911(b) provides, in pertinent part, as follows:

SEC. 911. EARNED INCOME FROM SOURCES WITHOUT THE UNITED STATES.

(b) DEFINITION OF EARNED INCOME.—* * * the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered * * * In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income.

material income-producing factor in Thomas' publishing business, then under section 911(b) the amount of compensation for personal services is no more than 30 percent of Thomas' share of the net profits from Publisher.[26]

Whether capital is a material income-producing factor, within the meaning of section 911(b), is a factual question which must be determined from all the facts and circumstances of the case. *Rousku v. Commissioner*, 56 T.C. 548, 550 (1971). Capital "is ordinarily a material income-producing factor if the operation of the business requires substantial inventories or substantial investments in plant, machinery, or other equipment", and not if the "gross income of the enterprise consists principally of fees, commissions, or other compensation for personal services." *Rousku v. Commissioner*, 56 T.C. at 551. See sec. 1.1348-3(a)(3)(ii), Income Tax Regs.[27]

If both capital and other factors play important roles in generating income, then capital is a material income-producing factor within the meaning of section 911(b). *Curry v. United States*, 804 F.2d 647, 653 (Fed. Cir. Ct. App. 1986); *Hicks v. United States*, 787 F.2d 1018, 1021 (5th Cir. 1986); *Friedlander v. United States*, 718 F.2d 294, 297 (9th Cir. 1983); *Moore v. Commissioner*, 71 T.C. 533, 539 (1979). Accordingly, it is not enough for the taxpayer to show that

---

[Sec. 911 was substantially revised by sec. 111(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 190. That revision and the amendments subsequent thereto do not affect the instant case. The last sentence of sec. 911(b), as set forth above, appears in present law as sec. 911(d)(2)(B) of the Internal Revenue Code of 1986.]

[26] An amendment to sec. 1348(b)(1)(A) (by sec. 442(a) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2878) applied sec. 911(b) without regard to the 30-percent limitation for taxable years beginning after Dec. 31, 1978. This amendment does not apply to the instant case.

[27] Sec. 1.1348-3 Definitions.

(a) *Earned income*—* * *

\*     \*     \*     \*     \*     \*     \*

(3) Earned income from business in which capital is material. * * *

(ii) Whether capital is a material income-producing factor must be determined by reference to all the facts of each case. *Capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business,* as reflected, for example, by a substantial investment in inventories, plant, machinery, or other equipment. In general, *capital is not a material income-producing factor where gross income of the business consists principally of fees, commissions, or other compensation for personal services performed by an individual.* Thus, the practice of his profession by a doctor, dentist, lawyer, architect, or accountant will not, as such, be treated as a trade or business in which capital is a material income-producing factor even though the practitioner may have a substantial capital investment in professional equipment or in the physical plant constituting the office from which he conducts his practice since his capital investment is regarded as only incidental to his professional practice. [Emphasis supplied.]

personal services are a material income-producing factor. On the other hand, capital is vital for almost every business, and so it is not enough for respondent to show that capital is used in the business. Finally, petitioners bear the burden of proof on this issue.

In *Rousku,* the taxpayer operated an automobile body repair business. The business' customers were charged separately for material and parts, and for labor. We noted that about 50 percent of the business' gross receipts and 40 percent of the business' gross income came from sales of material and parts. When we took into account the taxpayer's machinery and equipment, as well as his inventory, we concluded as follows (56 T.C. at 552):

> The capital employed by [the taxpayer] was not merely incidental to his personal services but contributed materially to the production of his income. We think his business was the kind of activity for which the 30 percent of gross income exclusion was designed.[28]

In *Hicks v. United States, supra,* the taxpayers ran a general construction contracting business. Much of the construction work was done by subcontractors, but the taxpayers did some of the work themselves. The Court of Appeals, in affirming the District Court's grant of judgment n.o.v. to the United States, concluded as follows (787 F.2d at 1021, 1022):

> On this record, it simply cannot be denied that the furnishing of capital—the components of a building—played a material role in the [taxpayers'] generation of income. * * * The personal services they provided cannot, on the facts of this case, be separated from their contractual obligation to build a building. Capital was a material factor in the production of their income. * * *

In *Moore v. Commissioner, supra,* we held that a retail business selling its inventory of groceries necessarily employs capital as a material income-producing factor even though the taxpayers' services were substantial and important in preparing and presenting the store's inventory for

---

[28]In *Rousku v. Commissioner,* 56 T.C. 548 (1971), the effect of our determination was to limit the amount excludable from taxable income under sec. 911(a). In the instant case, we are to determine petitioners' eligibility for the "maxitax" of sec. 1348. In both cases, the statute makes the sec. 911(b) definition control, and so the *Rousku* analysis carries as much weight in the instant sec. 1348 case as it would in a sec. 911(a) case. *Moore v. Commissioner,* 71 T.C. 533, 538 (1979); *Rousku v. Commissioner,* 56 T.C. at 550, and cases there cited.

retail sale. In *Moore,* the capital employed as inventory was of substantial value and of primary importance. 71 T.C. at 539. There were also substantial investments in depreciable assets. The gross income generated by the business in *Moore* came entirely from the price paid for the inventory, not from any fees, commissions, or other compensation paid directly for personal services of the taxpayers. 71 T.C. at 539.

In *United States v. Van Dyke,* 696 F.2d 957 (Fed. Cir. Ct. App. 1982), on which petitioners rely, the taxpayer operated a taxidermy supply business. The taxpayer designed and produced artificial eyes, forms, wood panels, and other materials, selling them to commercial and museum taxidermists. The machinery and equipment necessary for the production of taxidermy supplies was not extensive. The predominant factor in the taxpayer's business was not capital, but the personal skill and expertise of the taxpayer in designing and sculpting finished taxidermy products such as eyes and casts for forms. The taxpayer also trained and supervised his employees in obtaining the taxpayer's skills. Based on these facts, the Court of Appeals for the Federal Circuit concluded that "Where * * * the value added by personal skills is so substantial that capital investment, by comparison is relatively small, capital will not be deemed to be an income-producing factor in the business." 696 F.2d at 962.

In *Van Kalker v. Commissioner,* 804 F.2d 967 (7th Cir. 1984), revg. 81 T.C. 91 (1983), the taxpayer was in the business of fabricating wrought iron railings. The taxpayer's equipment consisted of two metal cutters, four welders, and some handmade tools. Each railing was individually designed, fabricated, and installed. The taxpayer designed and installed the railings, and supervised six to seven employees who fabricated the railings. No completed railings were kept in stock. In determining whether the capital used by the taxpayer in the railing business was a material income-producing factor under section 1348, the Court of Appeals stated as follows (804 F.2d at 969-970):

To determine whether capital is an income-producing factor, we consider both the form of the income and the nature of the business.

The fact that a tangible product results from a business does not mean that capital is an income-producing factor. * * *

The fact that capital is necessary, even vital, to the production of income also does not prove that it is a material factor. * * * The use of capital must not only be necessary; it must also be substantial * * *

Far more important than the amount of capital is how the capital is employed in the business. The test is whether the capital is income-producing in its own right or whether its worth depends on the application of the taxpayer's personal skills. * * *

In holding that capital was not a material income producing factor, the Court of Appeals stressed the importance of the taxpayer's artistic skill and effort in custom-designing the ornamental ironwork. 804 F.2d at 970. The court stated as follows (804 F.2d at 970):

Here, the iron rods are almost useless as an income-producing factor without [the taxpayer's] skills. This is not a case where the gross income is attributable to a markup on the resale or the installation of unaltered materials. * * * For example, an artist's paint brushes and easels are not income producing capital but are the implements through which the artist exercises his personal skills. Here, [the taxpayer's] tools and machinery were not income-producing without his skills; rather they were merely the conduit for his personal skills * * * His customers paid fees for his skill and effort; although they received a tangible product, the product's value, and thus [the taxpayer's] income, was produced by his personal services. * * *

In the instant case, Publisher did not merely buy and sell, unaltered, the books that were its stock in trade. Publisher published the books. In this aspect, the instant case is not on all fours with *Moore* (retailing of groceries), *Friedlander* (retailing or wholesaling of jewelry), and *Rousku* (sale of auto materials and parts in connection with auto repair services). On the other hand, Publisher's gross receipts came entirely from the sale of books, and not from fees charged for the furnishing of services. In this respect, the facts of the instant case are as strong for respondent as *Moore* and *Friedlander,* and even stronger than *Rousku, Hicks* (construction general contracting), and *Curry* (funerals, including caskets and burials), in all of which the Court held that capital was a material income-producing factor.

The instant case is clearly distinguishable from *Van Dyke* and *Van Kalker.* Thomas' role in the production of Publisher's books was that of a manager overseeing production,

setting book prices, and soliciting manuscripts. The record is void of any evidence that Thomas wrote any of the books. Obviously, the value of scientific and educational books to Publisher's customers was the information contained therein and not the tangible product (i.e., the paper and binding) which conveyed the information. However, it was the scientific and literary skills and efforts of the books' authors, and not Thomas' skills, which the books served as a conduit to convey. Thomas' skills were focused more on mass-producing copies of the books which conveyed the ideas as opposed to individually producing a customized book for each purchaser. Thomas' skills involved publishing the tangible products, which he accomplished by using a substantial amount of capital investment consisting of some $6 million in inventory and equipment. Publisher used the equipment to produce the inventory of books; it sold the inventory of books to generate its income. In contrast to *Van Dyke* and *Van Kalker*, the equipment and inventory were not useless as an income-producing factor without Thomas' skills. Rather, they were a vital, necessary, and substantial part of Publisher's business and served as a material income-producing factor.

We conclude that capital was a material income-producing factor in Publisher's business. As a result, under section 911(b), Thomas' earned income from this business is limited to "a reasonable allowance as compensation for the personal services rendered by [Thomas], not in excess of 30 percent of * * * the net profits of" Publisher's business.

The next question is what would have been reasonable compensation for Thomas' personal services in Publisher's business; this question is one of fact which must be resolved on the basis of all the facts and circumstances in the case. *Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner*, 528 F.2d 176, 179 (10th 1975), affg. 61 T.C. 564 (1974); *Pacific Grains, Inc. v. Commissioner*, 399 F.2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court;[29] *Home Interiors & Gifts, Inc. v. Commissioner*, 73 T.C. 1142, 1155 (1980); *Levenson & Klein, Inc. v. Commissioner*, 67 T.C. 694, 711 (1977). Many factors are relevant in determining what is reasonable compensation for a person's

---

[29]T.C. Memo. 1967-7.

services, including the following: the person's qualifications; the nature, extent, and scope of the person's work; the size and complexities of the business; comparison of size and complexities with similar businesses; and the prevailing rates of compensation for comparable positions in comparable concerns. *Mayson Mfg. Co. v. Commissioner,* 178 F.2d 115, 119 (6th Cir. 1949), a Memorandum Opinion of this Court dated November 16, 1948. In determining whether income arises from personal services within the meaning of section 911(b), we must focus on the source of the income and how it was generated. *Kramer v. Commissioner,* 80 T.C. 768 (1983).

We agree with respondent that petitioners would not benefit under section 1348 unless their personal service income exceeded about $213,000.[30] Of this amount, $10,101 is supplied by undisputed wage and salary income that petitioners reported on their tax return. No other source of personal service income is suggested. Thus, the question we must decide is whether Thomas had more than about the remaining $203,000 of personal service income from Publisher's business for 1978. Petitioners bear the burden of proving the amount of reasonable personal service income under section 1348. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a).[31]

Firstly, it is not clear that the 30-percent limit would permit us to conclude that more than $73,512 is eligible for treatment as personal service income from Publisher's business—an amount far short of the $203,000 minimum necessary in order for petitioners to derive any benefit from section 1348.[32]

---

[30]Sec. 1348 provides for a complicated formula which allows a taxpayer the benefits of a 50-percent maximum tax rate only where personal service income (with some adjustments) exceeds the sum of (1) the taxpayer's items of tax preference, (2) a small percentage of the taxpayer's itemized deductions and personal exemption deductions, and (3) $55,200 (the maximum joint return taxable income amount on which the marginal 1978 tax rates (sec. 1(a)(1)) did not exceed 50 percent). Petitioners' tax preferences for 1978 totaled $154,900, not taking into account the dispute as to whether they are entitled to "roll over" any of the gain on their sale of Marye's Hill Farm, discussed *infra.*

[31]Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

[32]Thomas' 1978 net profit from Publisher's business is $245,040, calculated as follows:

$38,987 — Net profit reported on petitioners' tax return
15,737 — Adjustments to net profit conceded by petitioners
190,316 — Erroneous 1978 inventory writedowns
245,040

Secondly, petitioners have failed to present sufficient evidence from which we could conclude that the amount of reasonable compensation for Thomas' personal services exceeded $203,000. No expert witnesses were presented as to the value of Thomas' services. No comparisons were presented of compensation received by others in similar business circumstances. No information was presented as to Thomas' income from Publisher for years before 1978, or whether Publisher's profitability had been built up over a period of time (and if it had been built up, then the extent to which Thomas was responsible for any such buildup).

Petitioners have failed to carry their burden of proving error in respondent's determination that their personal service income was not great enough for the maxitax to provide any benefit to them for 1978.

We conclude that petitioners are not eligible for the benefits of the maximum tax on personal service income for 1978.

We hold for respondent on this issue.

### III. *Marye's Hill*

Petitioners contend that Marye's Hill was their principal residence during 1974 until 1978, the time of its sale, and recognition of the gain they realized on the sale[33] is deferred

---

Applying the 30-percent limit to $245,040 would result in a maximum of $73,512 eligible for personal service income treatment.

Sec. 1.1348-3(a)(3)(i), Income Tax Regs., defines "net profits" of Publisher's business for these purposes as "the excess of gross income from such trade or business * * * over the deductions attributable to such trade or business." The $190,316 inventory adjustment for 1978 affects Publisher's gross income for that year and so affects Publisher's net profits. However, the sec. 481 adjustment appears to be, by its terms, an adjustment to taxable income—it is neither an adjustment to gross income nor to "the deductions attributable to such trade or business." Consequently, it may be that the statute precludes our taking the sec. 481 adjustment into account for these purposes.

We note that, if we were to take the sec. 481 adjustment into account for maxitax purposes, then it would have the effect of permitting a much greater amount to be treated as personal service income than would have been the case if Publisher had begun earlier to use a proper inventory accounting method. Thus, if we were to take the sec. 481 adjustment into account, then Thomas would be rewarded for having persisted in having Publisher use an inventory accounting method that distorted income. We will not interpret the statute so as to reach so perverse a result unless the language of the statute, or its legislative history, requires such a result. See *Woods v. Commissioner,* 91 T.C. 88, 97 n. 18 (1988); *Pallottini v. Commissioner,* 90 T.C. 498 (1988). We do not believe that the statute we deal with, or its legislative history, requires so perverse a result.

[33]Petitioners realized a gain of $181,142 on their sale of Marye's Hill; they concede (and they reported on their tax return) that $10,350 of this gain is to be recognized, and not rolled over, because their adjusted sales price on Marye's Hill ($353,000 less $17,650 equals $335,350) exceeds their cost of the new residence ($325,000) by that amount.

under section 1034 because petitioners acquired a new residence within 18 months of the Marye's Hill sale.

Respondent contends that petitioners' sale of Marye's Hill does not qualify for deferral of gain recognition under section 1034 because Marye's Hill was not petitioners' principal residence at the time of its sale. In making this contention, respondent asserts that the evidence establishes that petitioners and their children were continuous residents of Florida from at least 1975 until the time Marye's Hill was sold. Respondent also asserts that petitioners failed to present any objective evidence (i.e., evidence other than petitioners' testimony) establishing that Marye's Hill was their principal residence at the time of its sale.

We agree with petitioners.

Under the general rule of section 1001(c),[34] petitioners are required to recognize their entire gain on the sale of Marye's Hill. However, section 1034(a)[35] provides that if (1) an "old residence" is used by the taxpayer as his or her principal residence, (2) the taxpayer sells the old residence and, within a period of 18 months before or after the date of this sale, the taxpayer buys a "new residence", and (3) the taxpayer uses the new residence as his or her principal residence, then (4) any gain from this sale shall be recognized only to the extent that the taxpayer's adjusted sales price for the old residence exceeds the taxpayer's cost of buying the new residence.

Section 1.1034-1(c)(3)(i), Income Tax Regs., provides, in pertinent part, as follows:

---

[34]SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(c) RECOGNITION OF GAIN OR LOSS.—Except as otherwise provided in this subtitle [subtitle A, relating to income taxes], the entire amount of the gain or loss, determined under this section, on the sale or exchange of property shall be recognized.

[35]SEC. 1034. SALE OR EXCHANGE OF RESIDENCE.

(a) NONRECOGNITION OF GAIN.—If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him, and, within a period beginning 18 months before the date of such sale and ending 18 months after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b)) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

[The subsequent amendments of the heading of sec. 1034 (by sec. 405(c)(1) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2863, 2871) and of sec. 1034(a) (by sec. 122(a) of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, 197) do not affect the instant case.]

(3) *Property used by the taxpayer as his principal residence.* (i) Whether or not property is used by the taxpayer as his residence, and whether or not property is used by the taxpayer as his principal residence (in the case of a taxpayer using more than one property as a residence), depends upon all the facts and circumstances in each case, including the good faith of the taxpayer. * * *

If the provisions of section 1034 apply, then nonrecognition is mandatory. H. Rept. 82-586, at 109 (1951) (to accompany H.R. 4473, the Revenue Act of 1951), 1951-2 C.B. 357, 435; S. Rept. 82-781, pt. 2, at 32 (1951), 1951-2 C.B. 545, 566; sec. 1.1034-1(a), Income Tax Regs. In order to be entitled to the benefits of section 1034, petitioners must prove that they have satisfied all of the section's requirements. *Welch v. Helvering, supra; Shaw v. Commissioner,* 69 T.C. 1034, 1038 (1978); Rule 142.[36]

In *Stolk v. Commissioner,* 40 T.C. 345, 353, 355 (1963), affd. 326 F.2d 760 (2d Cir. 1964), we stated as follows:

The elements of residence are the fact of abode and the intention of remaining, and the concept of residence is made up of a combination of acts and intention. Neither bodily presence alone nor intention alone will suffice to create a residence. * * *

The phrase "used by the taxpayer as his principal residence" means habitual use of the old residence as the principal residence. The antithesis is nonuse of property as the principal residence.

"The term 'residence' is used in contradistinction to property used in trade or business and property held for the production of income. Nevertheless, the mere fact that the taxpayer temporarily rents out either the old or the new residence may not, in light of all the facts and circumstances in the case, prevent the gain from being not recognized."[37] H. Rept. 82-586, at 109 (1951), 1951-2 C.B.

---

[36]The record is not clear as to whether Coral Gables is the "new residence", within the meaning of sec. 1034(a). Since the parties agree that the only dispute is as to whether Marye's Hill is the "old residence", within the meaning of sec. 1034(a), we have made findings regarding Coral Gables and the other requirements of sec. 1034 only insofar as these findings assist us in determining whether Marye's Hill is the old residence. There is no dispute as to whether the other requirements of sec. 1034 have been satisfied. Accordingly, we treat respondent as having conceded that the other requirements of sec. 1034 have been satisfied.

[37]The Court of Appeals for the Ninth Circuit interpreted this legislative history as follows: "we read the legislative history of section 1034 as stating that a former residence could qualify for nonrecognition of gain even if the residence was temporarily rented and also qualified as being held for the production of income." *Bolaris v. Commissioner,* 776 F.2d 1428, 1432 (9th Cir. 1985), affg. in part and revg. in part 81 T.C. 840 (1983). In so stating, the Ninth Circuit held that a taxpayer can deduct both rental expenses under secs. 167 and 212 and qualify for nonrecognition of gain under sec. 1034. 776 F.2d at 1432-1434.

357, 436; S. Rept. 82-781, Part 2, p. 32 (1951), 1951-2 C.B. 545, 566. The term "principal" means one's chief or main place of residence. *Stolk v. Commissioner*, 40 T.C. at 351.

The benefits of section 1034 are available only on the sale of property used by the taxpayer as his principal residence. *Aagaard v. Commissioner*, 56 T.C. 191, 202-203, 206 (1971). Although the property sold must be the principal residence at the time it is sold, there is no requirement that the taxpayer actually occupy the putative old residence at the time of its sale. *Clapham v. Commissioner*, 63 T.C. 505, 508-510 (1975); *Aagaard v. Commissioner*, 56 T.C. at 202. See *Houlette v. Commissioner*, 48 T.C. 350, 354 (1967). However, the property's status as a principal residence can be more uncertain when the taxpayer is not occupying it at the time of its sale. Compare *Clapham v. Commissioner*, *supra; Aagaard v. Commissioner*, *supra;* and *Trisko v. Commissioner*, 29 T.C. 515 (1957); with *Houlette v. Commissioner*, 48 T.C. at 354; and *Stolk v. Commissioner*, 40 T.C. at 350-355. See generally J. Maule, Taxation of Residence Transactions 496-499 (1985). We must look at all the facts and circumstances in determining whether a property is a principal residence. *Clapham v. Commissioner*, 63 T.C. at 509-512; *Aagaard v. Commissioner*, 56 T.C. at 202-203; *Houlette v. Commissioner*, 48 T.C. at 355.

In the instant case, we must decide whether Marye's Hill was petitioners' principal residence at the time it was sold. From the record it is clear that from early 1974 onward, the place where petitioners resided shifted between Marye's Hill, Key Largo, Ocean Reef, and Coral Gables. Petitioners actually lived at Marye's Hill from early 1974 to December 1, 1975; from December 1, 1975, to April 13, 1977, Thomas made frequent trips from Florida to Illinois and stayed at Marye's Hill; from April 13, 1977 to October 24, 1977, petitioners actually lived at Marye's Hill; and after October 24, 1977, Thomas again made frequent trips from Florida to Illinois and stayed at Marye's Hill. During the periods of

---

The instant case does not involve the propriety of any rental deductions nor is there any evidence of any rental activity which indicates that Marye's Hill was held for the production of income. In light of these facts, we need not address the application of the Ninth Circuit's position in *Bolaris* to the facts in the instant case.

time that petitioners lived in Florida, and from October 24, 1977, to June 30, 1978, Marye's Hill was never rented and it was maintained by a housekeeper, and none of its furnishings was removed. The foregoing facts indicate that Marye's Hill served as petitioners' personal residence (and was not property used in a trade or business). We conclude that Marye's Hill was a residence of petitioners from early 1974 to June 30, 1978.

The next question is whether Marye's Hill was petitioners' *principal* residence at the time it was sold. In cases where a taxpayer lived in more than one place, in deciding which place was the taxpayer's principal place of residence and whether a residence retained its status as principal residence at the time it was sold, we have taken into account such factors as: (1) The amount of time spent at one residence as opposed to another; (2) whether the taxpayer abandoned the residence with the intent not to return and his nonuse of the property was substantial from the time he left the property; and (3) whether a temporary rental of a residence was necessitated because of an adverse real estate market as opposed to converting a residence into a nontemporary rental for the production of income. See *Clapham v. Commissioner,* 63 T.C. at 509-510; *Houlette v. Commissioner,* 48 T.C. at 358; *Stolk v. Commissioner, supra.* The foregoing factors are not exclusive nor an exhaustive list but merely illustrate that we must weigh all the facts and circumstances of a particular case in deciding whether a particular property is a principal residence. *Clapham v. Commissioner,* 63 T.C. at 508. In addition, what might appear as a relevant factor in one case may have no relevance in another case. *Clapham v. Commissioner,* 63 T.C. at 510.

In the instant case, during the 4-plus years from early 1974 to June 30, 1978, petitioners actually lived at Marye's Hill half the time and in one or another of three Florida houses half the time. Whenever they were living in Florida during this period, Thomas returned to Marye's Hill about every 3 weeks. Nothing in the record shows that, when petitioners were living at Marye's Hill, either of the petitioners spent substantial time in Florida. Petitioners'

residence time in Illinois during this period was spent entirely at Marye's Hill. Petitioners' residence time in Florida, on the other hand, was divided among three locations. Petitioners spent 11 months in an apartment in Key Largo. Petitioners spent 5 months in Ocean Reef (7 months after they left Ocean Reef, they sold it[38]). Petitioners spent 8 months in Coral Gables. When petitioners determined that they had to sell property in order to obtain funds in early 1978, they put up for sale both Marye's Hill and Coral Gables.

The foregoing strongly suggests that, of their four residences during the period from early 1974 to June 30, 1978, Marye's Hill was their principal residence throughout the period.

The following additional factors also point to Marye's Hill, and away from any of the Florida residences, as the principal residence: (a) Throughout the period, Thomas' sole business location was in Springfield, Illinois, (b) petitioners filed Illinois State income tax returns as full-year residents through 1977 and as part-year residents for 1978, and (c) petitioner Joan M. Thomas (1) was a registered voter in Illinois, (2) contributed to and attended a church in Springfield, Illinois, and (3) had only an Illinois driver's license.

We conclude that Marye's Hill was petitioners' principal residence when petitioners sold it, in 1978.

Respondent argues that petitioners have failed to present any objective facts showing petitioners' intent to treat Marye's Hill as a residence. Citing section 1.183-2(a) and (b), Income Tax Regs., respondent asserts that where a taxpayer's intent is at issue, objective facts are given more weight than a taxpayer's statement of his intent. Although in the context of section 1.183-2(a) and (b), Income Tax Regs., more weight is given to objective facts, neither section 1034 nor the regulations thereunder require a taxpayer to prove residence by objective facts alone. The regulations specifically provide that one must weigh all the facts and circumstances including the good faith of the taxpayer. Sec. 1.1034-1(c)(3)(i), Income Tax Regs.; see *Clapham v. Commis-*

---

[38]The parties have stipulated that this sale does not trigger the limitation provided by sec. 1034(d).

*sioner,* 63 T.C. at 508. We have weighed the evidence as to both the objective and subjective facts in the instant case. We hold for petitioners on this issue.

*Decision will be entered under Rule 155.*