T.C. Memo. 1997-493


UNITED STATES TAX COURT


GARY B. AND KATHLEEN MITCHELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20851-95.                    Filed November 3, 1997.


<u>Douglas Scott Maynard</u> and <u>Basis J. Boutris</u>, for
petitioners.

<u>Michael F. Steiner</u> and <u>Dale A. Zusi</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined income tax
deficiencies for petitioners' 1987 and 1988 taxable years in the
amounts of $24,716 and $91,878, respectively.  Respondent also
determined additions to tax for negligence in the amounts of
$1,236 for 1987 and $4,594 for 1988.  After considering

agreements and concessions by the parties, the remaining issues are: (1) Whether petitioners are entitled to roll over the gain on the sale of their residence under section 1034,[1] (2) if entitled to roll over the gain whether any of the improvements made to the new principal residence qualify for the rollover, and (3) whether petitioners are liable for additions to tax for negligence for the 1987 and/or the 1988 taxable year(s).

## FINDINGS OF FACT[2]

Petitioners, at the time their petition was filed, resided in San Jose, California. Petitioners' 1988 residence (Freemont property) had not been listed for sale when they were approached by a real estate broker who presented an attractive offer that petitioners accepted. The sale occurred on June 21, 1988. The gain realized on the sale of the Freemont property was $238,380. The sale occurred quickly and petitioners, who were required to vacate, purchased as a transitional measure the model townhouse in a new development while they searched for a permanent replacement residence. Petitioners were aware that to obtain the rollover of any gain from the sale of the Freemont property under section 1034 they would have to obtain and use replacement

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2] The parties' stipulation of facts and attached exhibits are incorporated by this reference.

property as their principal residence by June 21, 1990. About 15 months after the sale of the Freemont property, petitioners located and purchased for $314,000 a permanent replacement residence (Fairway residence). The Fairway residence was an older residence that petitioners intended to improve and modernize. The interior of the Fairway residence was functional and completely inhabitable from the date of petitioners' purchase. The carport, outside condition, and shrubbery were in a state of disrepair. At the time of purchase, petitioners did not move into the Fairway residence. Instead they began some improvements, including tree removal and limited internal renovations. They also hired an architect and made plans for improvements. The planned improvements, however, were changed at least once prior to the commencement of substantial internal renovations of the Fairway residence. The architectural plans that were used for the renovations were dated June 5, 1990.

Petitioners' adult son, Matthew, was transferred to a job location about 125 miles from his and petitioners' home city. Matthew sold his home located in the same city as petitioners' residences, and while he was in transition between jobs and in the process of establishing his new residence at the new job location, petitioners allowed Matthew to use the Fairway residence. Matthew's use of the house was for several months during the first half of 1990. About the time of Matthew's use, petitioners installed telephone and cable television service.

Matthew used the Fairway residence until late May 1990 when he moved to the townhouse and used it until he purchased a new home during July 1990.

During the spring of 1990 petitioners were packing their personal belongings, planning their move, and arranging for sale of their interim residence (townhouse).  The townhouse and the Fairway residence were only a few blocks apart.  Throughout the period concluding on June 21, 1990, petitioners moved items into the Fairway residence, including lamps, boxes of clothing, furniture, and household items.  The townhouse was placed on the market without a broker by means of a "For Sale" sign and petitioner wife personally undertook the effort to sell it.  Due in part to the advice of a real estate developer, petitioners left some of their furniture in the townhouse and heated and air-conditioned it during the period it was for sale to improve the chances of sale.

On June 20, 1990, petitioners, in order to complete the process of moving into the Fairway residence, hired movers to handle some heavy items, including a gun safe, large china closet, large boxes of books, and other heavy items that they were unable to move themselves.  As of June 20, 1990 petitioners had moved all of their belongings into the Fairway residence, leaving some of their furniture at the townhouse.  On June 20, 1990, the U.S. Postal Service effected petitioners' change of mailing address from the townhouse to the Fairway residence.

Petitioners' neighbor observed their use of the Fairway residence prior to June 21, 1990, and believed that petitioners resided there.

As of the 2-year deadline, petitioners had moved all of their personal belongings into the Fairway property; however, the major renovations had not been commenced as of the June 21, 1990 deadline. In that connection, a building permit for kitchen and bathroom additions to the Fairway residence was applied for June 21, 1990, and granted June 27, 1990. Construction of the kitchen and bathroom additions was accomplished during the period July through the fall of 1990. A building permit for the garage addition to the Fairway residence was applied for June 21, 1990, and granted June 27, 1990. Construction of the garage was begun during July and completed during the fall of 1990. The county building inspector, who inspected the construction at the Fairway residence location, confirmed that no work was commenced on the garage, kitchen, or bathroom additions prior to the June 27, 1990, granting of the building permits. Various inspections during September 1990 confirmed that the kitchen and bathroom additions were not yet complete as of that month. The kitchen and bathroom additions received their final approval on December 7, 1990. Numerous checks used as payment for the above-described construction were dated on or prior to June 21, 1990, but not negotiated and/or cashed or deposited by the payee until after June 21, 1990, and mostly during July or August 1990. Many of

the checks to pay the construction company were dated, and cashed
or negotiated during September, October, and November 1990.

The following amounts were paid for improvements to the
Fairway residence that were commenced and completed after June
21, 1990:

| Payee | Amount |
|-------|--------|
| Fontaine Glass | $4,858 |
| Moore Painting | 4,000 |
| A.B. Plumbing | 148 |
| Oswaldo de Santiago | 150 |
| R.W. Construction | 90,000 |
| Woodburners | 2,829 |
| ATNIP Co. | 5,793 |
| Budget Electric | 4,692 |
| Total | 112,470 |

The person who ultimately purchased the townhouse
(petitioners' interim residence) first viewed the property during
June 1990 and returned about ten times through the time of
purchase during the spring of 1991. The purchaser recalled that
the townhouse contained furnishings but the closets and cabinets
were empty in that the townhouse did not contain clothing, food,
or other personal belongings. The purchaser made the decision to
purchase the townhouse during December 1990 or January 1991.

The utility usage for the period January through October
1990 reflected that the utility consumption at the townhouse
exceeded that of the Fairway residence. During the month of
November the utility use at the Fairway residence increased and
decreased at the townhouse (both precipitously) and for December
1990 use at the Fairway residence exceeded that of the townhouse.

The utility use at the Fairway residence, even though less in amount than at the townhouse, tripled in the May - June 1990 period. Likewise, telephone use records for July through November 1990 reflect that more calls were made from the townhouse during the predawn and evening hours than at the Fairway residence. Although a relatively large number of daytime calls were made from the Fairway residence, many of those calls concerned the construction and improvements and could have been made by the construction company.

## ULTIMATE FINDINGS OF FACT

Petitioners used the Fairway residence as their principal residence prior to June 21, 1990. A total of $112,470 for improvements petitioners claimed to be commenced and/or completed, were not commenced or completed prior to June 21, 1990, and do not qualify for rollover of gain under section 1034. Petitioners misrepresented the amount of basis or cost in the new property and were negligent.

## OPINION

The primary issue here is whether petitioners met the requirements of section 1034. That section permits the rollover or nonrecognition of gain on the sale of a principal residence if a new residence "is purchased and used by the taxpayer as his principal residence", in this case, within 2 years of the sale. Sec. 1034(a). Petitioners contend that they moved in and continuously used the Fairway residence as their principal

residence prior to the June 21, 1990, deadline.  Respondent, relying on utility and telephone usage at the temporary townhouse and the replacement or principal residence (Fairway), contends that the record does not support petitioners' contentions and proffered testimony.

Section 1.1034-1(c)(3)(i), Income Tax Regs., contains the following standard for use of a principal residence:

> Whether or not property is used by the taxpayer as his residence, and whether or not property is used by the taxpayer as his principal residence (in the case of a taxpayer using more than one property as a residence), depends upon all the facts and circumstances in each case, including the good faith of the taxpayer.  * * *

Section 1.1034-1(d)(1), Income Tax Regs., explains further that

> if the taxpayer, during the period within which the purchase and use of the new residence must be made in order to have any gain on the sale of the old residence not recognized under this section, purchases more than one property which is used by him as his principal residence * * *, only the last of such properties shall be considered a new residence * * *

Petitioners bear the burden of showing their entitlement to the benefits of section 1034 by proving they have satisfied all of the section's requirements.  Thomas v. Commissioner, 92 T.C. 206, 242 (1989) (citing  Welch v. Helvering, 290 U.S. 111 (1933) and Rule 142(a)).  In particular, petitioners must show here that they used the Fairway residence as their principal residence.  In that regard, we said in Stolk v. Commissioner, 40 T.C. 345, 353, 355 (1963), affd. 326 F.2d 760 (2d Cir. 1964):

> The elements of residence are the fact of abode and the intention of remaining, and the concept of residence is

made up of a combination of acts and intention.
Neither bodily presence alone nor intention alone will
suffice to create a residence.  * * *

*         *         *         *         *         *         *

The phrase "used by the taxpayer as his principal
residence" means habitual use of the old residence as
the principal residence.  The antithesis is nonuse of
property as the principal residence.  [Citations
omitted; fn. ref. omitted; see also Thomas v.
Commissioner, supra.]

Petitioners sought to rollover any gain realized on the sale
of their Freemont property by the purchase of a permanent
replacement residence (Fairway residence) within the 2-year
period.  After the unexpected receipt of an offer and the sale of
their Freemont property, petitioners purchased a townhouse as a
temporary or interim residence until a permanent replacement
property could be located.  There is no question that the
townhouse then became petitioners' principal residence which was
used prior to the June 21, 1990, deadline under section 1034.
Just 15 months after the Freemont property sale, however,
petitioners purchased the Fairway residence and moved their
personal belongings, other than some furniture[3], into the new
residence prior to the 2-year deadline under section 1034.
Petitioners also planned to make improvements to the Fairway
residence but were not able to begin the vast majority of such
improvements until after the 2-year period ended.

---

[3] Some of petitioners' furniture was left in the townhouse
to enhance its salability rather than leaving that property empty
while petitioners attempted to sell it.

Petitioners changed their mail delivery from the townhouse to the Fairway residence, established telephone and other utility services at the Fairway residence, and their son Matthew lived there for a period of time prior to the 2-year deadline. Petitioners, during May 1990, caused Matthew to move out of the Fairway residence so that they could move in. Matthew had to store some of his furniture and moved to the townhouse which he intermittently used until he purchased his own property during July 1990.

Petitioners intended to and did make Fairway, both legally and physically, their principal residence prior to the June 21, 1990, deadline. Respondent, however, has shown by competent evidence that petitioners' use of the townhouse was substantial for about 6 months following the deadline. Respondent has shown that the townhouse utility usage was at least five times larger than the Fairway residence utility usage during the critical period just following June 21 through November 1990 when construction at the Fairway residence was completed. For example, the July 1990 utility costs for the townhouse and Fairway residence were $110.95 and $20.90, respectively.

Petitioners counter that the townhouse property was being intermittently used by Matthew, and that the air-conditioning was being operated to better facilitate the showing and sale of the townhouse which had been offered for sale since June. Petitioners further explained that they were attempting to sell

the property without a broker and that petitioner wife spent her days at the property, using the telephone and doing the family's laundry while she was posted there for the sale of the townhouse. Petitioners also attempt to explain a pattern of telephone calls reflecting that the townhouse telephone was used more and at the crucial times (early and late in the day) when a family member would normally be home, by explaining that: plans were being made for Matthew's wedding; Matthew was using the phone early and late in the day when he stayed in the townhouse; and petitioner wife would use the phone while she was at the townhouse.

Although petitioners' explanations would account for some of the inconsistencies between the utility bills and petitioners' alleged use of Fairway and/or townhouse, the evidence in this case supports our finding that the townhouse property was being used to an extent greater than has been explained by petitioners. Petitioners have shown by a preponderance of the evidence that they used Fairway as their principal residence prior to June 21, 1990. That evidence includes their testimony and that of their son, Matthew, a business associate, a neighbor, a construction workman, and the buyer of the townhouse, all of whom corroborate petitioners' testimony about their use of the Fairway residence as their principal residence prior to June 21, 1990. However, a disparity remains between petitioners' explanation and certain of the evidence in the case.

From our perspective, the disparity between respondent's circumstantial evidence and the petitioners' evidence is due to petitioners' attempt to show that the improvements to the Fairway residence were begun and/or completed prior to June 21, 1990. Petitioners make this argument in order to rollover additional gain in the amount of $112,470[4] in improvements to Fairway. By contending that they continuously used the Fairway residence from May 1990 on, petitioners counter one of respondent's arguments that the Fairway residence was uninhabitable due to the extensive improvements and disruption to the property. In an attempt to show that the Fairway residence's improvements were begun prior to June 21, 1990, petitioners contended that they had moved into the Fairway residence and stayed there throughout the period under consideration. This contention is apparently to give the appearance that the Fairway residence did not need or undergo extensive renovations after June 21, 1990.

Although petitioners had purchased what they intended to be the permanent replacement residence (Fairway) 7 months before the June 21, 1990, deadline under section 1034, the Fairway residence was older and in need of extensive internal renovations. Petitioners were at all times acutely aware of the deadline and attempted to make plans to improve the Fairway residence prior to

[4] The $112,470 would represent nearly one-half of a $238,380 gain realized on the Freemont property for which petitioners seek rollover under sec. 1034.

moving in. An architect was hired and the plans were made and revamped; however, the major renovations were not begun or made before the June 21, 1990, deadline. Confronted with this situation, petitioners moved into the Fairway residence in late May 1990 and used the property in a manner and amount that would satisfy its use as a permanent residence under the statute and then began the more extensive renovations which created the inconvenience and/or forced limited use of the Fairway residence. In that regard, the residence's master bedroom and bathroom were under construction. Additionally, a garage was being constructed adjacent to the residence. These renovations created conditions which, at very least, made the Fairway residence less than habitable. At the end of June 1990, after petitioners had used Fairway as their principal residence, they obtained the building permits and the extensive renovation was begun. It was after that time they utilized the townhouse to ameliorate the inconvenience caused by the extensive renovations. They argued that their use of Fairway was continuous in order to show that the renovations were begun before June 21, 1990, and that there was no change in the residence's condition or their usage.[5] The

[5] In connection with that argument, petitioners dated numerous checks (that were eventually used to pay for renovations) June 21, 1990 (the last day in the 2-year period), but did not negotiate them and/or the checks were not cashed by the payees until substantially after June 21, 1990. Most of the "June 21 checks" were cashed by the construction/payees during July and August 1990.

record, however, only supports petitioners' argument that Fairway was used as their principal residence prior to the critical date, but the improvements were not begun within that same time frame.

Petitioners' attempt to concoct a scenario to be able to defer gain based on the renovations caused their testimony, and that of five people they called as witnesses, to be incongruous and out of sync with the circumstantial evidence offered by respondent. Based on the record before us, the only logical explanation for the incongruity is one where petitioners established the Fairway residence as their principal residence and then relied on the townhouse to get them through the heavy renovation construction that was commenced after the June 21, 1990 deadline.

Respondent cites several cases where the taxpayer only partially complied with the use requirement of section 1034. For example, in Bayley v. Commissioner, 35 T.C. 288 (1960), moving a few pieces of furniture was insufficient to satisfy the used as principal residence requirement. In Henry v. Commissioner, T.C. Memo. 1982-469, even circumstances beyond the taxpayer's control that kept them from moving into the new residence did not mitigate or obviate the use requirement. Here, petitioners used Fairway as their principal residence and took the necessary legal and physical steps to make Fairway their permanent residence. The precarious aspect of petitioners' situation is their ownership of two residences, presenting the question as to which

should be considered the principal one.  It was this aspect that allowed respondent to make a presentation showing the potential for petitioner's failure to meet the strict requirement of section 1034.  Ultimately, however, petitioners passed the threshold use test, and then proceeded to renovate necessitating their use of the townhouse to allay the inconvenience and difficulties encountered in their renovation.  We hold that the Fairway residence was used as petitioner's principal residence prior to the 2-year limit on June 21, 1990.

We also note that petitioners, although well aware of the 2-year limitation and even though they purchased what was to be their permanent replacement residence 7 months prior to the 2-year deadline, allowed matters to slip to the point where they risked losing the benefit of any rollover whatsoever.  The timing in this case placed petitioners in a precarious position where they attempted to make it appear that renovations were commenced and/or completed, when they were not.  By waiting until the very end of the 2-year period, petitioners risked losing any section 1034 benefit.

Respondent, in the event that we decide that petitioners met the threshold test of section 1034 regarding the Fairway residence, alternatively argues that petitioners are not entitled to treat $112,470 of the improvements made to the Fairway residence as part of the cost of that residence for purposes of section 1034.  Section 1.1034-1(b)(7), Income Tax Regs., defines

the "Cost of purchasing the new residence" as the "total of all amounts which are attributable to the acquisition, construction, reconstruction, and improvements constituting capital expenditures". Unless the reconstruction or improvement to the new residence is commenced within the replacement period, none of the cost may be considered part of the "Cost of purchasing the new residence". See, e.g., sec. 1.1034-1(b)(7), (c)(4)(iii), Income Tax Regs.

The record is replete with evidence that the improvements claimed to have been made by petitioners were not begun prior to June 21, 1990. The dates that checks were negotiated and/or cashed, the dates of building permits and inspections, and the testimony of the county building inspector all firmly establish that the garage, kitchen, and bathroom additions/renovations were not commenced until after June 21, 1990, and, therefore, that petitioners' expenditures for those projects do not enter into the cost of the new residence eligible for rollover treatment. We hold that $112,470 of the improvements to the Fairway residence were commenced after June 21, 1990, and do not qualify for section 1034 treatment. See Kern v. Granquist, 291 F.2d 29 (9th Cir. 1961).

Finally, we consider whether petitioners are liable for additions to tax attributable to their negligence for 1987 and 1988. Respondent determined additions to tax for negligence under section 6653(a)(1)(A) and (B) for 1987 and section

6653(a)(1) for 1988.  For 1987, if any part of the underpayment is due to negligence, the addition to tax is 5 percent of the underpayment, plus 50 percent of the interest due on the part of the underpayment that is due to negligence.  In this instance, respondent determined that the entire underpayment was due to negligence.  For 1988, if any part of the underpayment is due to negligence, the addition to tax is 5 percent of the underpayment.

Negligence is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).  Petitioners bear the burden of proving that additions to tax do not apply.  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Petitioners claimed on their return that substantial amounts of renovations ($112,470) were part of the cost of the new residence and thus eligible for section 1034 treatment, knowing that those renovations had not been begun prior to the 2-year limit.  Compounding their claim, they dated checks to make it appear that the total amount claimed on their tax return qualified, knowing that such dates were not correct. Accordingly, for the 1988 taxable year in which petitioners would have been required to report any gain which was not rolled over, they are negligent.  In addition, petitioners did not offer any evidence to show that any portion of any underpayment for 1987

was not due to negligence.[6]  Petitioners simply argue that they are entitled to section 1034 treatment and, accordingly, are not negligent.  That argument only addresses the negligence issue for 1988.  Regarding respondent's 1987 negligence determination, petitioners have failed to carry their burden inasmuch as they did not present any evidence relevant to that determination.

We hold petitioners liable for additions to tax for negligence for 1987 and 1988, as determined by respondent, to the extent of any underpayment decided for those years.

To reflect the foregoing and concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155.</u>

---

[6] The 1987 income tax deficiency was based on seven income adjustments and a self-employment tax adjustment.  Of the seven adjustments, respondent appears to have conceded one and the parties settled the others.